# NATIONAL LABOR RELATIONS BOARD *v.* JONES & LAUGHLIN STEEL CORP.*

No. 419.  Argued February 10, 11, 1937.—Decided April 12, 1937.

---

* No. 419, *National Labor Relations Board* v. *Jones & Laughlin Steel Corp.*; Nos. 420 and 421, *National Labor Relations Board* v. *Fruehauf Trailer Co., post,* p. 49; Nos. 422 and 423, *National Labor Relations Board* v. *Friedman-Harry Marks Clothing Co., post,* p. 58; No. 365, *Associated Press* v. *National Labor Relations Board, post,* p. 103; and No. 469, *Washington, Virginia & Maryland Coach Co.* v. *National Labor Relations Board, post,* p. 142, which are known as the "Labor Board Cases," were disposed of in five separate opinions. The dissenting opinion, *post,* p. 76, applies to Nos. 419, 420 and 421, and 422 and 423.  The dissenting opinion, *post,* p. 133, applies to No. 365.  The opinion in No. 469 was unanimous.

1

2

4

*Mr. J. Warren Madden* and *Solicitor General Reed,* with whom *Attorney General Cummings* and *Messrs. Charles E. Wyzanski, Jr., Charles A. Horsky, A. H. Feller, Charles Fahy, Robert B. Watts, Philip Levy,* and *Malcolm F. Halliday* were on the brief, for petitioner.*

---

* Arguments in this case are summarized from the briefs. Extracts from the oral arguments in this and in other Labor Act cases immediately following will appear in an appendix in the bound volume.

6

8

10

12

*Mr. Earl F. Reed,* with whom *Messrs. Charles Rosen* and *W. D. Evans* were on the brief, for respondent.

14

16

18

20

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

In a proceeding under the National Labor Relations Act of 1935,[1] the National Labor Relations Board found that the respondent, Jones & Laughlin Steel Corporation, had violated the Act by engaging in unfair labor practices affecting commerce. The proceeding was instituted by the Beaver Valley Lodge No. 200, affiliated with the Amalgamated Association of Iron, Steel and Tin Workers of America, a labor organization. The unfair labor practices charged were that the corporation was discriminating against members of the union with regard to hire and tenure of employment, and was coercing and intimidating its employees in order to interfere with their self-organization. The discriminatory and coercive action alleged was the discharge of certain employees.

The National Labor Relations Board, sustaining the charge, ordered the corporation to cease and desist from such discrimination and coercion, to offer reinstatement to ten of the employees named, to make good their losses in pay, and to post for thirty days notices that the corporation would not discharge or discriminate against members, or those desiring to become members, of the labor union. As the corporation failed to comply, the Board petitioned the Circuit Court of Appeals to enforce the order. The court denied the petition, holding that the order lay beyond the range of federal power. 83 F. (2d) 998. We granted certiorari.

The scheme of the National Labor Relations Act—which is too long to be quoted in full—may be briefly stated. The first section sets forth findings with respect to the injury to commerce resulting from the denial by employers of the right of employees to organize and from the refusal of employers to accept the procedure of col-

---

[1] Act of July 5, 1935, 49 Stat. 449, 29 U. S. C. 151.

lective bargaining. There follows a declaration that it is the policy of the United States to eliminate these causes of obstruction to the free flow of commerce.[2] The Act

---

[2] This section is as follows:

"Section 1. The denial by employers of the right of employees to organize and the refusal by employers to accept the procedure of collective bargaining lead to strikes and other forms of industrial strife or unrest, which have the intent or the necessary effect of burdening or obstructing commerce by (a) impairing the efficiency, safety, or operation of the instrumentalities of commerce; (b) occurring in the current of commerce; (c) materially affecting, restraining, or controlling the flow of raw materials or manufactured or processed goods from or into the channels of commerce, or the prices of such materials or goods in commerce; or (d) causing diminution of employment and wages in such volume as substantially to impair or disrupt the market for goods flowing from or into the channels of commerce.

"The inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract, and employers who are organized in the corporate or other forms of ownership association substantially burdens and affects the flow of commerce, and tends to aggravate recurrent business depressions, by depressing wage rates and the purchasing power of wage earners in industry and by preventing the stabilization of competitive wage rates and working conditions within and between industries.

"Experience has proved that protection by law of the right of employees to organize and bargain collectively safeguards commerce from injury, impairment, or interruption, and promotes the flow of commerce by removing certain recognized sources of industrial strife and unrest, by encouraging practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions, and by restoring equality of bargaining power between employers and employees.

"It is hereby declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection."

then defines the terms it uses, including the terms "commerce" and "affecting commerce." § 2. It creates the National Labor Relations Board and prescribes its organization. §§ 3–6. It sets forth the right of employees to self-organization and to bargain collectively through representatives of their own choosing. § 7. It defines "unfair labor practices." § 8. It lays down rules as to the representation of employees for the purpose of collective bargaining. § 9. The Board is empowered to prevent the described unfair labor practices affecting commerce and the Act prescribes the procedure to that end. The Board is authorized to petition designated courts to secure the enforcement of its orders. The findings of the Board as to the facts, if supported by evidence, are to be conclusive. If either party on application to the court shows that additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearings before the Board, the court may order the additional evidence to be taken. Any person aggrieved by a final order of the Board may obtain a review in the designated courts with the same procedure as in the case of an application by the Board for the enforcement of its order. § 10. The Board has broad powers of investigation. § 11. Interference with members of the Board or its agents in the performance of their duties is punishable by fine and imprisonment. § 12. Nothing in the Act is to be construed to interfere with the right to strike. § 13. There is a separability clause to the effect that if any provision of the Act or its application to any person or circumstances shall be held invalid, the remainder of the Act or its application to other persons or circumstances shall not be affected. § 15. The particular provisions which are involved in the instant case will be considered more in detail in the course of the discussion.

The procedure in the instant case followed the statute. The labor union filed with the Board its verified charge.

The Board thereupon issued its complaint against the respondent alleging that its action in discharging the employees in question constituted unfair labor practices affecting commerce within the meaning of § 8, subdivisions (1) and (3), and § 2, subdivisions (6) and (7) of the Act. Respondent, appearing specially for the purpose of objecting to the jurisdiction of the Board, filed its answer. Respondent admitted the discharges, but alleged that they were made because of inefficiency or violation of rules or for other good reasons and were not ascribable to union membership or activities. As an affirmative defense respondent challenged the constitutional validity of the statute and its applicability in the instant case. Notice of hearing was given and respondent appeared by counsel. The Board first took up the issue of jurisdiction and evidence was presented by both the Board and the respondent. Respondent then moved to dismiss the complaint for lack of jurisdiction; and, on denial of that motion, respondent in accordance with its special appearance withdrew from further participation in the hearing. The Board received evidence upon the merits and at its close made its findings and order.

Contesting the ruling of the Board, the respondent argues (1) that the Act is in reality a regulation of labor relations and not of interstate commerce; (2) that the Act can have no application to the respondent's relations with its production employees because they are not subject to regulation by the federal government; and (3) that the provisions of the Act violate § 2 of Article III and the Fifth and Seventh Amendments of the Constitution of the United States.

The facts as to the nature and scope of the business of the Jones & Laughlin Steel Corporation have been found by the Labor Board and, so far as they are essential to the determination of this controversy, they are not in dispute. The Labor Board has found: The corporation is

organized under the laws of Pennsylvania and has its principal office at Pittsburgh. It is engaged in the business of manufacturing iron and steel in plants situated in Pittsburgh and nearby Aliquippa, Pennsylvania. It manufactures and distributes a widely diversified line of steel and pig iron, being the fourth largest producer of steel in the United States. With its subsidiaries—nineteen in number—it is a completely integrated enterprise, owning and operating ore, coal and limestone properties, lake and river transportation facilities and terminal railroads located at its manufacturing plants. It owns or controls mines in Michigan and Minnesota. It operates four ore steamships on the Great Lakes, used in the transportation of ore to its factories. It owns coal mines in Pennsylvania. It operates towboats and steam barges used in carrying coal to its factories. It owns limestone properties in various places in Pennsylvania and West Virginia. It owns the Monongahela connecting railroad which connects the plants of the Pittsburgh works and forms an interconnection with the Pennsylvania, New York Central and Baltimore and Ohio Railroad systems. It owns the Aliquippa and Southern Railroad Company which connects the Aliquippa works with the Pittsburgh and Lake Erie, part of the New York Central system. Much of its product is shipped to its warehouses in Chicago, Detroit, Cincinnati and Memphis,—to the last two places by means of its own barges and transportation equipment. In Long Island City, New York, and in New Orleans it operates structural steel fabricating shops in connection with the warehousing of semi-finished materials sent from its works. Through one of its wholly-owned subsidiaries it owns, leases and operates stores, warehouses and yards for the distribution of equipment and supplies for drilling and operating oil and gas wells and for pipe lines, refineries and pumping stations. It has sales offices in

twenty cities in the United States and a wholly-owned subsidiary which is devoted exclusively to distributing its product in Canada. Approximately 75 per cent. of its product is shipped out of Pennsylvania.

Summarizing these operations, the Labor Board concluded that the works in Pittsburgh and Aliquippa "might be likened to the heart of a self-contained, highly integrated body. They draw in the raw materials from Michigan, Minnesota, West Virginia, Pennsylvania in part through arteries and by means controlled by the respondent; they transform the materials and then pump them out to all parts of the nation through the vast mechanism which the respondent has elaborated."

To carry on the activities of the entire steel industry, 33,000 men mine ore, 44,000 men mine coal, 4,000 men quarry limestone, 16,000 men manufacture coke, 343,000 men manufacture steel, and 83,000 men transport its product. Respondent has about 10,000 employees in its Aliquippa plant, which is located in a community of about 30,000 persons.

Respondent points to evidence that the Aliquippa plant, in which the discharged men were employed, contains complete facilities for the production of finished and semi-finished iron and steel products from raw materials; that its works consist primarily of a by-product coke plant for the production of coke; blast furnaces for the production of pig iron; open hearth furnaces and Bessemer converters for the production of steel; blooming mills for the reduction of steel ingots into smaller shapes; and a number of finishing mills such as structural mills, rod mills, wire mills and the like. In addition there are other buildings, structures and equipment, storage yards, docks and an intra-plant storage system. Respondent's operations at these works are carried on in two distinct stages, the first being the conversion of raw materials into pig

iron and the second being the manufacture of semi-finished and finished iron and steel products; and in both cases the operations result in substantially changing the character, utility and value of the materials wrought upon, which is apparent from the nature and extent of the processes to which they are subjected and which respondent fully describes. Respondent also directs attention to the fact that the iron ore which is procured from mines in Minnesota and Michigan and transported to respondent's plant is stored in stock piles for future use, the amount of ore in storage varying with the season but usually being enough to maintain operations from nine to ten months; that the coal which is procured from the mines of a subsidiary located in Pennsylvania and taken to the plant at Aliquippa is there, like ore, stored for future use, approximately two to three months' supply of coal being always on hand; and that the limestone which is obtained in Pennsylvania and West Virginia is also stored in amounts usually adequate to run the blast furnaces for a few weeks. Various details of operation, transportation, and distribution are also mentioned which for the present purpose it is not necessary to detail.

Practically all the factual evidence in the case, except that which dealt with the nature of respondent's business, concerned its relations with the employees in the Aliquippa plant whose discharge was the subject of the complaint. These employees were active leaders in the labor union. Several were officers and others were leaders of particular groups. Two of the employees were motor inspectors; one was a tractor driver; three were crane operators; one was a washer in the coke plant; and three were laborers. Three other employees were mentioned in the complaint but it was withdrawn as to one of them and no evidence was heard on the action taken with respect to the other two.

While respondent criticises the evidence and the attitude of the Board, which is described as being hostile toward employers and particularly toward those who insisted upon their constitutional rights, respondent did not take advantage of its opportunity to present evidence to refute that which was offered to show discrimination and coercion.   In this situation, the record presents no ground for setting aside the order of the Board so far as the facts pertaining to the circumstances and purpose of the discharge of the employees are concerned.   Upon that point it is sufficient to say that the evidence supports the findings of the Board that respondent discharged these men "because of their union activity and for the purpose of discouraging membership in the union."   We turn to the questions of law which respondent urges in contesting the validity and application of the Act.

*First.   The scope of the Act.*—The Act is challenged in its entirety as an attempt to regulate all industry, thus invading the reserved powers of the States over their local concerns.   It is asserted that the references in the Act to interstate and foreign commerce are colorable at best; that the Act is not a true regulation of such commerce or of matters which directly affect it but on the contrary has the fundamental object of placing under the compulsory supervision of the federal government all industrial labor relations within the nation.   The argument seeks support in the broad words of the preamble (section one [3]) and in the sweep of the provisions of the Act, and it is further insisted that its legislative history shows an essential universal purpose in the light of which its scope cannot be limited by either construction or by the application of the separability clause.

If this conception of terms, intent and consequent inseparability were sound, the Act would necessarily fall

---

[3] See Note 2, *supra*, p. 23.

by reason of the limitation upon the federal power which inheres in the constitutional grant, as well as because of the explicit reservation of the Tenth Amendment. *Schechter Corp.* v. *United States,* 295 U. S. 495, 549, 550, 554. The authority of the federal government may not be pushed to such an extreme as to destroy the distinction, which the commerce clause itself establishes, between commerce "among the several States" and the internal concerns of a State. That distinction between what is national and what is local in the activities of commerce is vital to the maintenance of our federal system. *Id.*

But we are not at liberty to deny effect to specific provisions, which Congress has constitutional power to enact, by superimposing upon them inferences from general legislative declarations of an ambiguous character, even if found in the same statute. The cardinal principle of statutory construction is to save and not to destroy. We have repeatedly held that as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the act. Even to avoid a serious doubt the rule is the same. *Federal Trade Comm'n* v. *American Tobacco Co.,* 264 U. S. 298, 307; *Panama R. Co.* v. *Johnson,* 264 U. S. 375, 390; *Missouri Pacific R. Co.* v. *Boone,* 270 U. S. 466, 472; *Blodgett* v. *Holden,* 275 U. S. 142, 148; *Richmond Screw Anchor Co.* v. *United States,* 275 U. S. 331, 346.

We think it clear that the National Labor Relations Act may be construed so as to operate within the sphere of constitutional authority. The jurisdiction conferred upon the Board, and invoked in this instance, is found in § 10 (a), which provides:

"SEC. 10 (a). The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 8) affecting commerce."

The critical words of this provision, prescribing the limits of the Board's authority in dealing with the labor practices, are "affecting commerce." The Act specifically defines the "commerce" to which it refers (§ 2 (6)):

"The term 'commerce' means trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia or any Territory of the United States and any State or other Territory, or between any foreign country and any State, Territory, or the District of Columbia, or within the District of Columbia or any Territory, or between points in the same State but through any other State or any Territory or the District of Columbia or any foreign country."

There can be no question that the commerce thus contemplated by the Act (aside from that within a Territory or the District of Columbia) is interstate and foreign commerce in the constitutional sense. The Act also defines the term "affecting commerce" (§ 2 (7)):

"The term 'affecting commerce' means in commerce, or burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce."

This definition is one of exclusion as well as inclusion. The grant of authority to the Board does not purport to extend to the relationship between all industrial employees and employers. Its terms do not impose collective bargaining upon all industry regardless of effects upon interstate or foreign commerce. It purports to reach only what may be deemed to burden or obstruct that commerce and, thus qualified, it must be construed as contemplating the exercise of control within constitutional bounds. It is a familiar principle that acts which directly burden or obstruct interstate or foreign commerce, or its free flow, are within the reach of the congressional power. Acts having that effect are not

rendered immune because they grow out of labor disputes. See *Texas & N. O. R . Co.* v. *Railway Clerks*, 281 U. S. 548, 570; *Schechter Corp.* v. *United States, supra,* pp. 544, 545; *Virginian Railway* v. *System Federation, No. 40,* 300 U. S. 515. It is the effect upon commerce, not the source of the injury, which is the criterion. *Second Employers' Liability Cases,* 223 U. S. 1, 51. Whether or not particular action does affect commerce in such a close and intimate fashion as to be subject to federal control, and hence to lie within the authority conferred upon the Board, is left by the statute to be determined as individual cases arise. We are thus to inquire whether in the instant case the constitutional boundary has been passed.

*Second. The unfair labor practices in question.*—The unfair labor practices found by the Board are those defined in § 8, subdivisions (1) and (3). These provide:

Sec. 8. It shall be an unfair labor practice for an employer—

"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7."

"(3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: . . ."[4]

---

[4] What is quoted above is followed by this proviso—not here involved—"*Provided,* That nothing in this Act, or in the National Industrial Recovery Act (U. S. C., Supp. VII, title 15, secs. 701–712), as amended from time to time, or in any code or agreement approved or prescribed thereunder, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this Act as an unfair labor practice) to require as a condition of employment membership therein, if such labor organization is the representative of the employees as provided in section 9 (a), in the appropriate collective bargaining unit covered by such agreement when made."

Section 8, subdivision (1), refers to § 7, which is as follows:

"Sec. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection."

Thus, in its present application, the statute goes no further than to safeguard the right of employees to self-organization and to select representatives of their own choosing for collective bargaining or other mutual protection without restraint or coercion by their employer.

That is a fundamental right. Employees have as clear a right to organize and select their representatives for lawful purposes as the respondent has to organize its business and select its own officers and agents. Discrimination and coercion to prevent the free exercise of the right of employees to self-organization and representation is a proper subject for condemnation by competent legislative authority. Long ago we stated the reason for labor organizations. We said that they were organized out of the necessities of the situation; that a single employee was helpless in dealing with an employer; that he was dependent ordinarily on his daily wage for the maintenance of himself and family; that if the employer refused to pay him the wages that he thought fair, he was nevertheless unable to leave the employ and resist arbitrary and unfair treatment; that union was essential to give laborers opportunity to deal on an equality with their employer. *American Steel Foundries* v. *Tri-City Central Trades Council*, 257 U. S. 184, 209. We reiterated these views when we had under consideration the Railway Labor Act of 1926. Fully recognizing the legality of collective action on the part of employees in

order to safeguard their proper interests, we said that Congress was not required to ignore this right but could safeguard it. Congress could seek to make appropriate collective action of employees an instrument of peace, rather than of strife. We said that such collective action would be a mockery if representation were made futile by interference with freedom of choice. Hence the prohibition by Congress of interference with the selection of representatives for the purpose of negotiation and conference between employers and employees, "instead of being an invasion of the constitutional right of either, was based on the recognition of the rights of both." *Texas & N. O. R. Co.* v. *Railway Clerks, supra.* We have reasserted the same principle in sustaining the application of the Railway Labor Act as amended in 1934. *Virginian Railway Co.* v. *System Federation, No. 40, supra.*

*Third. The application of the Act to employees engaged in production.—The principle involved.*—Respondent says that whatever may be said of employees engaged in interstate commerce, the industrial relations and activities in the manufacturing department of respondent's enterprise are not subject to federal regulation. The argument rests upon the proposition that manufacturing in itself is not commerce. *Kidd* v. *Pearson,* 128 U. S. 1, 20, 21; *United Mine Workers* v. *Coronado Coal Co.,* 259 U. S. 344, 407, 408; *Oliver Iron Co.* v. *Lord,* 262 U. S. 172, 178; *United Leather Workers* v. *Herkert & Meisel Trunk Co.,* 265 U. S. 457, 465; *Industrial Association* v. *United States,* 268 U. S. 64, 82; *Coronado Coal Co.* v. *United Mine Workers,* 268 U. S. 295, 310; *Schechter Corp.* v. *United States, supra,* p. 547; *Carter* v. *Carter Coal Co.,* 298 U. S. 238, 304, 317, 327.

The Government distinguishes these cases. The various parts of respondent's enterprise are described as interdependent and as thus involving "a great movement of

iron ore, coal and limestone along well-defined paths to the steel mills, thence through them, and thence in the form of steel products into the consuming centers of the country—a definite and well-understood course of business." It is urged that these activities constitute a "stream" or "flow" of commerce, of which the Aliquippa manufacturing plant is the focal point, and that industrial strife at that point would cripple the entire movement. Reference is made to our decision sustaining the Packers and Stockyards Act.[5] *Stafford* v. *Wallace,* 258 U. S. 495. The Court found that the stockyards were but a "throat" through which the current of commerce flowed and the transactions which there occurred could not be separated from that movement. Hence the sales at the stockyards were not regarded as merely local transactions, for while they created "a local change of title" they did not "stop the flow," but merely changed the private interests in the subject of the current. Distinguishing the cases which upheld the power of the State to impose a non-discriminatory tax upon property which the owner intended to transport to another State, but which was not in actual transit and was held within the State subject to the disposition of the owner, the Court remarked: "The question, it should be observed, is not with respect to the extent of the power of Congress to regulate interstate commerce, but whether a particular exercise of state power in view of its nature and operation must be deemed to be in conflict with this paramount authority." *Id.,* p. 526. See *Minnesota* v. *Blasius,* 290 U. S. 1, 8. Applying the doctrine of *Stafford* v. *Wallace, supra,* the Court sustained the Grain Futures Act of 1922 [6] with respect to transactions on the Chicago Board of Trade, although these transactions were "not in and of themselves interstate commerce." Congress had found

[5] 42 Stat. 159.
[6] 42 Stat. 998.

that they had become "a constantly recurring burden and obstruction to that commerce." *Chicago Board of Trade* v. *Olsen,* 262 U. S. 1, 32; compare *Hill* v. *Wallace,* 259 U. S. 44, 69. See, also, *Tagg Bros. & Moorhead* v. *United States,* 280 U. S. 420.

Respondent contends that the instant case presents material distinctions. Respondent says that the Aliquippa plant is extensive in size and represents a large investment in buildings, machinery and equipment. The raw materials which are brought to the plant are delayed for long periods and, after being subjected to manufacturing processes, "are changed substantially as to character, utility and value." The finished products which emerge "are to a large extent manufactured without reference to pre-existing orders and contracts and are entirely different from the raw materials which enter at the other end." Hence respondent argues that "If importation and exportation in interstate commerce do not singly transfer purely local activities into the field of congressional regulation, it should follow that their combination would not alter the local situation." *Arkadelphia Milling Co.* v. *St. Louis Southwestern Ry. Co.,* 249 U. S. 134, 151; *Oliver Iron Co.* v. *Lord, supra.*

We do not find it necessary to determine whether these features of defendant's business dispose of the asserted analogy to the "stream of commerce" cases. The instances in which that metaphor has been used are but particular, and not exclusive, illustrations of the protective power which the Government invokes in support of the present Act. The congressional authority to protect interstate commerce from burdens and obstructions is not limited to transactions which can be deemed to be an essential part of a "flow" of interstate or foreign commerce. Burdens and obstructions may be due to injurious action springing from other sources. The fundamental principle is that the power to regulate commerce is

the power to enact "all appropriate legislation" for "its protection and advancement" (*The Daniel Ball*, 10 Wall. 557, 564); to adopt measures "to promote its growth and insure its safety" (*Mobile County* v. *Kimball*, 102 U. S. 691, 696, 697); "to foster, protect, control and restrain." *Second Employers' Liability Cases, supra*, p. 47. See *Texas & N. O. R. Co.* v. *Railway Clerks, supra*. That power is plenary and may be exerted to protect interstate commerce "no matter what the source of the dangers which threaten it." *Second Employers' Liability Cases*, p. 51; *Schechter Corp.* v. *United States, supra*. Although activities may be intrastate in character when separately considered, if they have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions, Congress cannot be denied the power to exercise that control. *Schechter Corp.* v. *United States, supra*. Undoubtedly the scope of this power must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government. *Id*. The question is necessarily one of degree. As the Court said in *Chicago Board of Trade* v. *Olsen, supra*, p. 37, repeating what had been said in *Stafford* v. *Wallace, supra*: "Whatever amounts to more or less constant practice, and threatens to obstruct or unduly to burden the freedom of interstate commerce is within the regulatory power of Congress under the commerce clause and it is primarily for Congress to consider and decide the fact of the danger and meet it."

That intrastate activities, by reason of close and intimate relation to interstate commerce, may fall within federal control is demonstrated in the case of carriers who

are engaged in both interstate and intrastate transportation. There federal control has been found essential to secure the freedom of interstate traffic from interference or unjust discrimination and to promote the efficiency of the interstate service. *Shreveport Case*, 234 U. S. 342, 351, 352; *Wisconsin Railroad Comm'n* v. *Chicago, B. & Q. R. Co.*, 257 U. S. 563, 588. It is manifest that intrastate rates deal *primarily* with a local activity. But in rate-making they bear such a close relation to interstate rates that effective control of the one must embrace some control over the other. *Id.* Under the Transportation Act, 1920,[7] Congress went so far as to authorize the Interstate Commerce Commission to establish a state-wide level of intrastate rates in order to prevent an unjust discrimination against interstate commerce. *Wisconsin Railroad Comm'n* v. *Chicago, B. & Q. R. Co., supra; Florida* v. *United States*, 282 U. S. 194, 210, 211. Other illustrations are found in the broad requirements of the Safety Appliance Act and the Hours of Service Act. *Southern Railway Co.* v. *United States*, 222 U. S. 20; *Baltimore & Ohio R. Co.* v. *Interstate Commerce Comm'n*, 221 U. S. 612. It is said that this exercise of federal power has relation to the maintenance of adequate instrumentalities of interstate commerce. But the agency is not superior to the commerce which uses it. The protective power extends to the former because it exists as to the latter.

The close and intimate effect which brings the subject within the reach of federal power may be due to activities in relation to productive industry although the industry when separately viewed is local. This has been abundantly illustrated in the application of the federal Anti-Trust Act. In the *Standard Oil* and *American Tobacco* cases, 221 U. S. 1, 106, that statute was applied to combinations of employers engaged in productive industry.

---

[7] §§ 416, 422, 41 Stat. 484, 488; Interstate Commerce Act, § 13 (4).

Counsel for the offending corporations strongly urged that the Sherman Act had no application because the acts complained of were not acts of interstate or foreign commerce, nor direct and immediate in their effect on interstate or foreign commerce, but primarily affected manufacturing and not commerce. 221 U. S. pp. 5, 125. Counsel relied upon the decision in *United States* v. *Knight Co.,* 156 U. S. 1. The Court stated their contention as follows: "That the act, even if the averments of the bill be true, cannot be constitutionally applied, because to do so would extend the power of Congress to subjects *dehors* the reach of its authority to regulate commerce, by enabling that body to deal with mere questions of production of commodities within the States." And the Court summarily dismissed the contention in these words: "But all the structure upon which this argument proceeds is based upon the decision in *United States* v. *E. C. Knight Co.,* 156 U. S. 1. The view, however, which the argument takes of that case and the arguments based upon that view have been so repeatedly pressed upon this court in connection with the interpretation and enforcement of the Anti-trust Act, and have been so necessarily and expressly decided to be unsound as to cause the contentions to be plainly foreclosed and to require no express notice" (citing cases). 221 U. S. pp. 68, 69.

Upon the same principle, the Anti-Trust Act has been applied to the conduct of employees engaged in production. *Loewe* v. *Lawlor,* 208 U. S. 274; *Coronado Coal Co.* v. *United Mine Workers, supra; Bedford Cut Stone Co.* v. *Stone Cutters' Assn.,* 274 U. S. 37. See, also, *Local 167* v. *United States,* 291 U. S. 293, 397; *Schechter Corp.* v. *United States, supra.* The decisions dealing with the question of that application illustrate both the principle and its limitation. Thus, in the first *Coronado* case, the Court held that mining was not interstate commerce, that the power of Congress did not extend to its regulation as such,

and that it had not been shown that the activities there involved—a local strike—brought them within the provisions of the Anti-Trust Act, notwithstanding the broad terms of that statute. A similar conclusion was reached in *United Leather Workers* v. *Herkert & Meisel Trunk Co., supra, Industrial Association* v. *United States, supra,* and *Levering & Garrigues Co.* v. *Morrin,* 289 U. S. 103, 107. But in the first *Coronado* case the Court also said that "if Congress deems certain recurring practices, though not really part of interstate commerce, likely to obstruct, restrain or burden it, it has the power to subject them to national supervision and restraint." 259 U. S. p. 408. And in the second *Coronado* case the Court ruled that while the mere reduction in the supply of an article to be shipped in interstate commerce by the illegal or tortious prevention of its manufacture or production is ordinarily an indirect and remote obstruction to that commerce, nevertheless when the "intent of those unlawfully preventing the manufacture or production is shown to be to restrain or control the supply entering and moving in interstate commerce, or the price of it in interstate markets, their action is a direct violation of the Anti-Trust Act." 268 U. S. p. 310. And the existence of that intent may be a necessary inference from proof of the direct and substantial effect produced by the employees' conduct. *Industrial Association* v. *United States,* 268 U. S. p. 81. What was absent from the evidence in the first *Coronado* case appeared in the second and the Act was accordingly applied to the mining employees.

It is thus apparent that the fact that the employees here concerned were engaged in production is not determinative. The question remains as to the effect upon interstate commerce of the labor practice involved. In the *Schechter* case, *supra,* we found that the effect there was so remote as to be beyond the federal power. To find "immediacy or directness" there was to find it "almost

everywhere," a result inconsistent with the maintenance of our federal system. In the *Carter* case, *supra,* the Court was of the opinion that the provisions of the statute relating to production were invalid upon several grounds,—that there was improper delegation of legislative power, and that the requirements not only went beyond any sustainable measure of protection of interstate commerce but were also inconsistent with due process. These cases are not controlling here.

*Fourth. Effects of the unfair labor practice in respondent's enterprise.*—Giving full weight to respondent's contention with respect to a break in the complete continuity of the "stream of commerce" by reason of respondent's manufacturing operations, the fact remains that the stoppage of those operations by industrial strife would have a most serious effect upon interstate commerce. In view of respondent's far-flung activities, it is idle to say that the effect would be indirect or remote. It is obvious that it would be immediate and might be catastrophic. We are asked to shut our eyes to the plainest facts of our national life and to deal with the question of direct and indirect effects in an intellectual vacuum. Because there may be but indirect and remote effects upon interstate commerce in connection with a host of local enterprises throughout the country, it does not follow that other industrial activities do not have such a close and intimate relation to interstate commerce as to make the presence of industrial strife a matter of the most urgent national concern. When industries organize themselves on a national scale, making their relation to interstate commerce the dominant factor in their activities, how can it be maintained that their industrial labor relations constitute a forbidden field into which Congress may not enter when it is necessary to protect interstate commerce from the paralyzing consequences of industrial war? We have often said that interstate commerce itself is a practical

conception. It is equally true that interferences with that commerce must be appraised by a judgment that does not ignore actual experience.

Experience has abundantly demonstrated that the recognition of the right of employees to self-organization and to have representatives of their own choosing for the purpose of collective bargaining is often an essential condition of industrial peace. Refusal to confer and negotiate has been one of the most prolific causes of strife. This is such an outstanding fact in the history of labor disturbances that it is a proper subject of judicial notice and requires no citation of instances. The opinion in the case of *Virginian Railway Co.* v. *System Federation, No. 40, supra,* points out that, in the case of carriers, experience has shown that before the amendment, of 1934, of the Railway Labor Act "when there was no dispute as to the organizations authorized to represent the employees and when there was a willingness of the employer to meet such representative for a discussion of their grievances, amicable adjustment of differences had generally followed and strikes had been avoided." That, on the other hand, "a prolific source of dispute had been the maintenance by the railroad of company unions and the denial by railway management of the authority of representatives chosen by their employees." The opinion in that case also points to the large measure of success of the labor policy embodied in the Railway Labor Act. But with respect to the appropriateness of the recognition of self-organization and representation in the promotion of peace, the question is not essentially different in the case of employees in industries of such a character that interstate commerce is put in jeopardy from the case of employees of transportation companies. And of what avail is it to protect the facility of transportation, if interstate commerce is throttled with respect to the commodities to be transported!

These questions have frequently engaged the attention of Congress and have been the subject of many inquiries.[8]  The steel industry is one of the great basic industries of the United States, with ramifying activities affecting interstate commerce at every point.  The Government aptly refers to the steel strike of 1919–1920 with its far-reaching consequences.[9]  The fact that there appears to have been no major disturbance in that industry in the more recent period did not dispose of the possibilities of future and like dangers to interstate commerce which Congress was entitled to foresee and to exercise its protective power to forestall.  It is not necessary again to detail the facts as to respondent's enterprise.  Instead of being beyond the pale, we think that it presents in a most striking way the close and intimate relation which a manufacturing industry may have to interstate commerce and we have no doubt that Congress had constitutional authority to safeguard the right of respondent's employees to self-organization and freedom in the choice of representatives for collective bargaining.

*Fifth.  The means which the Act employs.—Questions under the due process clause and other constitutional restrictions.*—Respondent asserts its right to conduct its business in an orderly manner without being subjected to arbitrary restraints.  What we have said points to the fallacy in the argument.  Employees have their correlative

---

[8] See, for example, Final Report of the Industrial Commission (1902), vol. 19, p. 844; Report of the Anthracite Coal Strike Commission (1902), Sen. Doc. No. 6, 58th Cong., spec. sess.; Final Report of Commission on Industrial Relations (1916), Sen. Doc. No. 415, 64th Cong., 1st sess., vol. I; National War Labor Board, Principles and Rules of Procedure (1919), p. 4; Bureau of Labor Statistics, Bulletin No. 287 (1921), pp. 52–64; History of the Shipbuilding Labor Adjustment Board, U. S. Bureau of Labor Statistics, Bulletin No. 283.

[9] See Investigating Strike in Steel Industries, Sen. Rep. No. 289, 66th Cong., 1st sess.

right to organize for the purpose of securing the redress
of grievances and to promote agreements with employers
relating to rates of pay and conditions of work. *Texas &
N. O. R. Co.* v. *Railway Clerks, supra; Virginian Railway
Co.* v. *System Federation, No. 40.* Restraint for the pur-
pose of preventing an unjust interference with that right
cannot be considered arbitrary or capricious. The provi-
sion of § 9 (a)[10] that representatives, for the purpose of
collective bargaining, of the majority of the employees in
an appropriate unit shall be the exclusive representatives
of all the employees in that unit, imposes upon the re-
spondent only the duty of conferring and negotiating
with the authorized representatives of its employees for
the purpose of settling a labor dispute. This provision
has its analogue in § 2, Ninth, of the Railway Labor Act
which was under consideration in *Virginian Railway Co.*
v. *System Federation, No. 40, supra.* The decree which
we affirmed in that case required the Railway Company
to treat with the representative chosen by the employees
and also to refrain from entering into collective labor
agreements with anyone other than their true representa-
tive as ascertained in accordance with the provisions of
the Act. We said that the obligation to treat with the
true representative was exclusive and hence imposed the
negative duty to treat with no other. We also pointed
out that, as conceded by the Government,[11] the injunc-

---

[10] The provision is as follows: "SEC. 9 (a) Representatives desig-
nated or selected for the purposes of collective bargaining by the
majority of the employees in a unit appropriate for such purposes,
shall be the exclusive representatives of all the employees in such
unit for the purposes of collective bargaining in respect to rates of
pay, wages, hours of employment, or other conditions of employment:
*Provided,* That any individual employee or a group of employees
shall have the right at any time to present grievances to their
employer."

[11] See *Virginian Railway Co.* v. *System Federation, No. 40,* 300
U. S. 515.

tion against the Company's entering into any contract concerning rules, rates of pay and working conditions except with a chosen representative was "designed only to prevent collective bargaining with anyone purporting to represent employees" other than the representative they had selected. It was taken "to prohibit the negotiation of labor contracts generally applicable to employees" in the described unit with any other representative than the one so chosen, "but not as precluding such individual contracts" as the Company might "elect to make directly with individual employees." We think this construction also applies to § 9 (a) of the National Labor Relations Act.

The Act does not compel agreements between employers and employees. It does not compel any agreement whatever. It does not prevent the employer "from refusing to make a collective contract and hiring individuals on whatever terms" the employer "may by unilateral action determine." [12] The Act expressly provides in § 9 (a) that any individual employee or a group of employees shall have the right at any time to present grievances to their employer. The theory of the Act is that free opportunity for negotiation with accredited representatives of employees is likely to promote industrial peace and may bring about the adjustments and agreements which the Act in itself does not attempt to compel. As we said in *Texas & N. O. R. Co.* v. *Railway Clerks, supra,* and repeated in *Virginian Railway Co.* v. *System Federation, No. 40, supra,* the cases of *Adair* v. *United States,* 208 U. S. 161, and *Coppage* v. *Kansas,* 236 U. S. 1, are inapplicable to legislation of this character. The Act does not interfere with the normal exercise of the right of the employer to select its employees or to discharge them. The employer may not, under cover of that right, intimidate or coerce its employees with respect to their

---

[12] See Note 11.

self-organization and representation, and, on the other hand, the Board is not entitled to make its authority a pretext for interference with the right of discharge when that right is exercised for other reasons than such intimidation and coercion. The true purpose is the subject of investigation with full opportunity to show the facts. It would seem that when employers freely recognize the right of their employees to their own organizations and their unrestricted right of representation there will be much less occasion for controversy in respect to the free and appropriate exercise of the right of selection and discharge.

The Act has been criticised as one-sided in its application; that it subjects the employer to supervision and restraint and leaves untouched the abuses for which employees may be responsible; that it fails to provide a more comprehensive plan,—with better assurances of fairness to both sides and with increased chances of success in bringing about, if not compelling, equitable solutions of industrial disputes affecting interstate commerce. But we are dealing with the power of Congress, not with a particular policy or with the extent to which policy should go. We have frequently said that the legislative authority, exerted within its proper field, need not embrace all the evils within its reach. The Constitution does not forbid "cautious advance, step by step," in dealing with the evils which are exhibited in activities within the range of legislative power. *Carroll* v. *Greenwich Insurance Co.*, 199 U. S. 401, 411; *Keokee Coke Co.* v. *Taylor*, 234 U. S. 224, 227; *Miller* v. *Wilson*, 236 U. S. 373, 384; *Sproles* v. *Binford*, 286 U. S. 374, 396. The question in such cases is whether the legislature, in what it does prescribe, has gone beyond constitutional limits.

The procedural provisions of the Act are assailed. But these provisions, as we construe them, do not offend against the constitutional requirements governing the

creation and action of administrative bodies. See *Interstate Commerce Comm'n* v. *Louisville & Nashville R. Co.*, 227 U. S. 88, 91. The Act establishes standards to which the Board must conform. There must be complaint, notice and hearing. The Board must receive evidence and make findings. The findings as to the facts are to be conclusive, but only if supported by evidence. The order of the Board is subject to review by the designated court, and only when sustained by the court may the order be enforced. Upon that review all questions of the jurisdiction of the Board and the regularity of its proceedings, all questions of constitutional right or statutory authority, are open to examination by the court. We construe the procedural provisions as affording adequate opportunity to secure judicial protection against arbitrary action in accordance with the well-settled rules applicable to administrative agencies set up by Congress to aid in the enforcement of valid legislation. It is not necessary to repeat these rules which have frequently been declared. None of them appears to have been transgressed in the instant case. Respondent was notified and heard. It had opportunity to meet the charge of unfair labor practices upon the merits, and by withdrawing from the hearing it declined to avail itself of that opportunity. The facts found by the Board support its order and the evidence supports the findings. Respondent has no just ground for complaint on this score.

The order of the Board required the reinstatement of the employees who were found to have been discharged because of their "union activity" and for the purpose of "discouraging membership in the union." That requirement was authorized by the Act. § 10 (c). In *Texas & N. O. R. Co.* v. *Railway Clerks, supra,* a similar order for restoration to service was made by the court in contempt proceedings for the violation of an injunction issued by the court to restrain an interference with

the right of employees as guaranteed by the Railway Labor Act of 1926. The requirement of restoration to service, of employees discharged in violation of the provisions of that Act, was thus a sanction imposed in the enforcement of a judicial decree.. We do not doubt that Congress could impose a like sanction for the enforcement of its valid regulation. The fact that in the one case it was a judicial sanction, and in the other a legislative one, is not an essential difference in determining its propriety.

Respondent complains that the Board not only ordered reinstatement but directed the payment of wages for the time lost by the discharge, less amounts earned by the employee during that period. This part of the order was also authorized by the Act. § 10 (c). It is argued that the requirement is equivalent to a money judgment and hence contravenes the Seventh Amendment with respect to trial by jury. The Seventh Amendment provides that "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." The Amendment thus preserves the right which existed under the common law when the Amendment was adopted. *Shields* v. *Thomas,* 18 How. 253, 262; *In re Wood,* 210 U. S. 246, 258; *Dimick* v. *Schiedt,* 293 U. S. 474, 476; *Baltimore & Carolina Line* v. *Redman,* 295 U. S. 654, 657. Thus it has no application to cases where recovery of money damages is an incident to equitable relief even though damages might have been recovered in an action at law. *Clark* v. *Wooster,* 119 U. S. 322, 325; *Pease* v. *Rathbun-Jones Engineering Co.,* 243 U. S. 273, 279. It does not apply where the proceeding is not in the nature of a suit at common law. *Guthrie National Bank* v. *Guthrie,* 173 U. S. 528, 537.

The instant case is not a suit at common law or in the nature of such a suit. The proceeding is one unknown to the common law. It is a statutory proceeding. Reinstatement of the employee and payment for time lost are

requirements imposed for violation of the statute and are remedies appropriate to its enforcement. The contention under the Seventh Amendment is without merit.

Our conclusion is that the order of the Board was within its competency and that the Act is valid as here applied. The judgment of the Circuit Court of Appeals is reversed and the cause is remanded for further proceedings in conformity with this opinion.

*Reversed.*

For dissenting opinion, see p. 76.