### UNITED STATES v. BARR & BLOOMFIELD SHOE MFG. CO. et al.

Cr. No. 5756.

District Court, D. New Hampshire.

Oct. 2, 1940.

76

Alexander Murchie, U. S. Atty., of Concord, N. H., and Vernon C. Stoneman and Allan A. Tepper, U. S. Department of Justice, both of Boston, Mass., for plaintiff.

Joseph B. Wolbarsht and Charles A. Rome, both of Boston, Mass., for defendants.

MORRIS, District Judge.

This is a criminal information filed July 24, 1940, against the Barr & Bloomfield Shoe Mfg. Co., a corporation organized under the laws of the State of New Hampshire, having its principal place of business in Seabrook in the District of New Hampshire, and Samuel Garfinkel of Lynn in the District of Massachusetts, treasurer and general manager of said corporation and Joseph King of Salem in said District of Massachusetts, foreman in charge of certain employees in said corporation.

The defendant corporation is engaged in the business of manufacturing, producing, and selling women's shoes to be shipped in interstate commerce.

The information charges numerous violations of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq.

On September 11, 1940, the defendants and each of them filed a demurrer to the information alleging the unconstitutionality of the entire Act and specifically certain provisions of the Act. Other less important grounds of demurrer were alleged.

The matter came on for hearing September 11, 1940, when the parties were heard orally and thereafter filed elaborate briefs.

The question of the constitutionality of the Fair Labor Standards Act lies at the foundation of the defendants' demurrer. If this were to be determined in defendants' favor, the other grounds of demurrer become immaterial.

There was a time, not so very long ago, when the term "interstate commerce" was held to apply to transactions between parties in one state and those of another. Manufacturing was held not to be commerce and was beyond the pale of constitutional provisions regulating interstate commerce. These observations may be well illustrated by quotations from various well considered opinions of the Supreme Court as then constituted.

In the case of Kidd v. Pearson, 128 U. S. 1, 9 S.Ct. 6, 10, 32 L.Ed. 346, decided in 1888, Mr. Justice Lamar discusses the distinction between manufactures and commerce in the following language:

"No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than that between manufactures and commerce. Manufacture is transformation—the fashioning of raw materials into a change of form for use. The functions of commerce are different. The buying and selling and the transportation incidental thereto constitute commerce; and the regulation of commerce in the constitutional sense embraces the regulation at least of such transportation."

The foregoing language was quoted with approval by Mr. Justice Sutherland in the case of Carter v. Carter Coal Company, 298 U.S. 238, 56 S.Ct. 855, 867, 80 L.Ed. 1160. Decided in 1936.

It is further observed by the Court in the case last above cited that the word "commerce" as used in the Constitution is the equivalent of the phrase "intercourse for the purposes of trade" and includes transportation, purchase, sale and exchange of commodities between the citizens of the different states, and the power to regulate commerce embraces the instruments by which commerce is carried on. That commodities produced or manufactured within a state are intended to be sold or transported outside the state does not render their production or manufacture subject to federal regulation under the commerce clause.

In the case of Schechter Corporation v. United States, 295 U.S. 495, 55 S.Ct. 837, 851, 79 L.Ed. 1570, 97 A.L.R. 947, Mr. Chief Justice Hughes speaking for the court says:

"Our growth and development have called for wide use of the commerce power of the federal government in its control over the expanded activities of interstate commerce, and in protecting that commerce from burdens, interferences, and conspiracies to restrain and monopolize it. But the authority of the federal government may not be pushed to such an extreme as to destroy the distinction, which the commerce clause itself establishes, between commerce 'among the several States' and the internal concerns of a state. The same answer must be made to the contention that is based upon the serious economic situation which led to the passage of the Recovery Act—the fall in prices, the decline in wages and employment, and the curtailment of the market for commodities. Stress is laid upon the great importance of maintaining wage distributions which would provide the necessary stimulus in starting 'the cumulative forces making for expanding commercial activity.' Without in any way disparaging this motive, it is enough to say that the recuperative efforts of the federal government must be made in a manner consistent with the authority granted by the Constitution.

"We are of the opinion that the attempt through the provisions of the code to fix the hours and wages of employees of defendants in their intrastate business was not a valid exercise of federal power."

It is true that the Schechter and Carter cases involve a consideration of the National Recovery Act and involved the question of the right of Congress to delegate its powers, but the delegation of power was not stressed in the opinions.

The Fair Labor Standards Act establishing minimum hours of labor and wages appears more closely connected with manufacturing and production than with interstate transportation. There must be a line of demarkation drawn between what directly affects interstate commerce and what only indirectly or inferentially influence it else all activities, including manufacturing and production, will be centralized in Congress.

I find no cases directly overruling in terms the principle of the cases above cited, and if the act in question is to be sustained it is because activities which formerly fell on one side of the line of demarkation are suddenly shifted to be included and classed with those on the other side.

That brings us to the question whether recent decisions of the highest court have in effect overruled a long line of decisions and extended the power of Congress to include what formerly was held to only indirectly influence interstate commerce.

The power of Congress to regulate interstate shipments of agencies harmful to other states from the state of origin has been frequently upheld and ought not to be questioned. Such regulatory acts have been upheld in connection with interstate shipments of alcoholic liquors, prison-made goods, lottery tickets, etc., but it is a far-cry to class the Fair Labor Standards Act with those above mentioned.

It is argued that the case of National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 57 S. Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, overrules the Carter and Schechter cases. To my mind it is hard to reconcile some of the language found in the Jones & Laughlin case with the language in the other cases, yet there is nothing in the former case which indicates that the court intended to overrule the two earlier cases.

One important distinction between the Schechter and the Jones & Laughlin case is that the defendant in the former case operated a poultry slaughterhouse exclusively within the State of New York. Some of the poultry slaughtered was shipped to them from outside the state and when delivered to the defendant its interstate shipment was ended and it became part and parcel of the general property within the state. The business of slaughtering the poultry so brought into the state was not a transaction in interstate commerce. It was not slaughtered for the purpose of shipment to any point outside New York.

Right here appears the distinction between the Schechter case and the Jones & Laughlin case. In the latter case the National Labor Relations Act, 29 U.S.C. A. § 151 et seq., was held to apply to goods manufactured for the purpose of shipment outside the state. This point of difference is made plain in the last quoted paragraph of Chief Justice Hughes' opinion in the Schechter case wherein he says: "we are of the opinion that the attempt through the provisions of the code to fix the hours and wages of employees of defendants in their intrastate business was not a valid exercise of federal power."

The distinction I have made between the Schechter case and the Jones & Laughlin case seems to have been brushed aside in the Carter case, wherein it is held that in the Schechter case the federal power was asserted with respect to commodities which had come to rest after their interstate transportation; while in the Carter case it deals with commodities at rest before interstate commerce has begun. It is held that the difference is without significance.

The question of what directly affects interstate commerce and what only indirectly affects it appears to present a question of fact that determines on which side of the line of demarkation the question falls.

The question of fact may be influenced and perhaps finally determined by the economic considerations prevailing at the time and the complex industrial relations existing.

The adherence to precedents is material and necessary in a well organized system of jurisprudence but it is not so sacred that it may not shift to conform to changing conditions of society. The Constitution has not changed, but the Congress has written a new definition to the phrase "interstate commerce". This it has done as a fact finding body and not as an exponent of constitutional law. The power of Congress under the commerce law is the power to regulate, that is, to prescribe the rule by which commerce is to be governed. The power is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the Constitution.

While it is sometimes said that the motive of Congress in the passage of an act is immaterial, it may be material in construing the act to take into consideration arguments founded upon common experience furnishing motive for the legislation. It is argued that it is a matter of common knowledge that producers with substandard and harmful labor conditions have an advantage over their competitors in selling goods in interstate commerce and that it is the use by such producers of the channels of interstate commerce, that to a considerable extent, is responsible for the continued and widespread existence of such conditions throughout the nation. Unsatisfactory labor and wage conditions are productive of labor troubles often resulting in strikes which undeniably have an immediate effect upon interstate commerce and the free flow of commerce. The two most prolific causes of labor disputes which obstruct commerce are unsatisfactory hours and wages and the refusal of employers to bargain collectively with the freely chosen representatives of their employees.

Congress in its effort to eliminate labor troubles that have a direct influence upon commerce has torn down the screen and reached out to regulate and correct influences lying at its foundation. With this policy I have no quarrel, and I can-

not say that in so doing it acted unwisely or beyond its constitutional power.

I hold that the Fair Labor Standards Act of 1938 is constitutional.

 Other grounds of demurrer have been examined, and while the language in some of the counts appears to me to be open to criticism, on the whole the offenses charged appear to be plainly set forth.

Demurrers overruled.