**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**FANT MILLING COMPANY, Inc., d/b/a Gladiola Biscuit Company, Respondent.**

**No. 8571.**

United States Court of Appeals Fourth Circuit.

Argued June 6, 1962.

Decided Sept. 19, 1962.

Melvin Pollack, Attorney, National Labor Relations Board (Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and James A. Ryan, Attorney, National Labor Relations Board, on brief), for petitioner.

R. D. Douglas, Jr., Greensboro, N. C. (Karl H. Mueller, Fort Worth, Tex., Douglas, Ravenel, Josey & Hardy, Greensboro, N. C., and Mueller & Mueller, Fort Worth, Tex., on brief), for respondent.

Before SOBELOFF, Chief Judge, and BOREMAN and BRYAN, Circuit Judges.

BOREMAN, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its order of November 22, 1961 (134 N.L.

R.B. No. 70), against Fant Milling Company, Inc., doing business as Gladiola Biscuit Company.[1] Fant Milling Company is a Texas corporation and has plants in several states including its plant in Greensboro, North Carolina, where the activities which concern us occurred. The sole question presented is whether there is substantial evidence on the record considered as a whole to support the Board's finding that the Company violated section 8(a) (1) of the National Labor Relations Act by discharging three employees for their acts and conduct which, according to the Board's decision, constituted concerted activity for their mutual aid or protection. We think there is not.

The Company manufactures rolls and biscuits at its Greensboro plant where, at the time of the occurrences here involved, it employed about seven truck drivers to deliver its products. Frank Kempner was employed during the summer of 1960 to supervise the Company's trucking deliveries. Sales Manager Grady Hale had actually hired Kempner with express authority from his superior in the Texas home office, and he assumed, as did Kempner, that he was Kempner's superior. There was no resident manager of the Greensboro plant which was controlled by the Company officers who lived in Texas. Three of the drivers, John Jones, his brother, Joe, and Edward Martin, were discharged on April 18–19, 1961.

The Board issued a complaint on June 6, 1961, charging the Company with several unfair labor practices in violation of section 8(a) (1) of the Act, including the dismissal of the three drivers which action also allegedly constituted a violation of section 8(a) (3) of the Act. After the hearing, however, the Board adopted the Trial Examiner's findings that the unfair labor charges were unsupported except to the extent that the dismissals were violations of section 8(a) (1); the 8(a) (3) charge was dropped. The

Board's order requires the Company to desist from discharging or otherwise discriminating against its employees for engaging in concerted activities for their mutual aid or protection and from interfering in any like or related manner with rights guaranteed its employees under section 7 of the Act. Affirmatively the Company was ordered to reinstate the dismissed employees with back pay, to post the usual notices, and to make its payroll and personnel records available to the Board.

Prior to his discharge, John Jones had been employed by the Company about two years. In January 1961 he was getting ready to leave on a trip to deliver biscuits when he noticed that his truck did not have a set of roller conveyors or "tracks" used in unloading. There were not enough tracks at that time for each truck to have a set and it had been customary for the drivers with seniority to get the sets that were available. John protested to Kempner, who explained that a new driver, unfamiliar with his route which included several stops, needed the tracks more than did John, who had only one stop to make. Refusing to accept Kempner's decision to let the new driver use the tracks, John called Hale who was then in Florida. Hale said he would require Kempner to give John the tracks. Later, when John found that the tracks had not been put in his truck, he picked them up and left on his scheduled trip.

On another occasion John had to drive an overloaded truck by an indirect route to its destination to avoid a weighing station. He was not compensated for the extra miles he had driven and complained about this to Kempner, who told him to take another such trip and that he would be paid extra for both trips. John received the extra pay and did not talk to Hale about this problem. John testified that he had had a few other insignificant disputes with Kempner but that he could not remember what they were about and that Kempner became angry when he (John) complained. He said, "we

---

1. Section 10(e) of the National Labor Relations Act, 61 Stat. 136, 147 (1947), as amended, 29 U.S.C.A. § 160(e) (1961 Supp.).

couldn't get anything done" at two or three meetings attended by Hale, Kempner and the drivers.

Early in February 1961 the other drivers asked John to arrange a meeting with Hale without Kempner. He did so and Hale invited all the drivers to a meeting at his home. Six accepted and arrived at the Hale residence shortly after noon one Saturday. They discussed John's complaint about the tracks, Edward Martin's complaint concerning his removal by Kempner on one occasion from a "run" he customarily made, and "a lot of little things" that no one could recall. The meeting turned into a party with the men having a steak dinner at a restaurant that evening; they also consumed some alcoholic beverages and ended the meeting-party about midnight.

John Jones testified that the only time he complained *to Hale* about Kempner's orders was when the conveyor-track incident occurred. He did say, however, that he went to Hale "a lot of times" on the drivers' behalf but he was unable to recall any particular occasion when he had done so or what matters were discussed with Hale. At another point, with some apparent self-contradiction, he indicated that he had no other disputes with Kempner, nor had any of the other drivers, to his knowledge.

Joseph Jones, John's brother, said he had had minor arguments with Kempner but he recalled only one of them. On one occasion he was not paid extra mileage for driving an overloaded truck around a weighing station; he complained about this to Kempner but did not mention it to Hale. Apparently nothing was ever done about the matter. He

said he could not talk to Kempner without arguing.[2]

Edward Martin had worked for the Company about two and a half years prior to his discharge. He was the senior driver and regularly made a long run through West Virginia, Kentucky, and Tennessee. The other drivers did not like the trip and were content to let Martin keep it. On one occasion in January 1961 Kempner assigned the run to another driver. Martin did not complain to Kempner but immediately placed a call to Hale, who was then in Miami, Florida. The next morning Hale called Kempner and told him to let Martin make the long trip as he customarily did. Kempner became angry and, in the presence of some of the drivers who were in his office at the time, said to Hale, "Why don't we fire all these damn griping truck drivers and get some good drivers?" Martin testified that Kempner had tried to get all the drivers off their regular runs, but Hale's uncontradicted testimony was that he and Kempner decided to alternate all the routes except Martin's to equalize the pay and that the drivers made no complaint.

Soon after Kempner began working at the plant, he gave Martin some instructions which Martin apparently did not like. Martin walked away and, according to Kempner's testimony, remarked to one of the warehousemen that no dispatcher was going to tell him what to do and that he was going down the road to figure out ways to mess him (Kempner) up. On another occasion Martin accused Kempner of trying to get him off his regular route to which Kempner responded, "Ed, that's just a damn lie." Martin told Kempner never to raise his voice to him again.

2. The only substantial factual dispute in the record concerns Joe's purported refusal to obey Kempner's order to take a truck to Salem, Virginia. The Board found that at the time of the "refusal" the Company was short of trucks and gave delivery trips to the drivers according to their seniority status. Once Joe did decline to take a trip to Salem but did so in order that another driver with less seniority could make the trip and earn some "grocery money" that week.

> Joe had just returned from one trip when he was given the opportunity to take the trip to Salem. Kempner and another Company official, McGill, testified with respect to the "refusal" incident, but neither could recall Joe's reason for refusing to take the trip. In view of the other circumstances surrounding this matter, the Board was justified in accepting Joe's explanation and account of the event.

It is conceded that the party or meeting at Hale's house in February 1961 was "concerted activity" which is protected by section 7 of the Act. However, the Company urges that the discharges in question had nothing whatsoever to do with that meeting. It is our view that the evidence supports the Company's position. First, it is undisputed that no one at the Greensboro plant had the authority to hire or fire anyone without permission from the Texas office. One V. I. Martin, vice-president of the Company, had received complaints about some of the truck drivers (whose names he did not know) from Kempner, McGill and J. W. Bannister, the latter two from the Texas office as was vice-president Martin himself. McGill had been told by a Kroger purchasing agent in Salem, Virginia, that Kroger was not satisfied with deliveries because the orders frequently arrived late due to the fact that the drivers refused to take the trip. The Kroger agent also told McGill that he thought the truck drivers were running the Gladiola operations. V. I. Martin went to Greensboro to investigate the complaints and reported to Mr. Fant, president of the Company, in Texas. Fant and Martin decided that they had to discharge Kempner or the drivers who could not get along with Kempner. They had no knowledge of the drivers' meeting with Hale or of any other concerted activity. The decision was reached to instruct Bannister to call Kempner and tell him to fire those drivers who did not cooperate with him. After receiving Bannister's phone call, Kempner gave dismissal notices and severance pay to the Jones brothers and Ed Martin. Kempner testified that he selected those men for dismissal because each wanted his own way as to trips, mileage and layovers and seemed to be continually demanding individual preferential treatment. Kempner said he had had no trouble with the other drivers.

The Board emphasized Kempner's admission that he resented having John Jones and Ed Martin go to Hale when problems arose. Kempner's reaction, though not admirable, is at least understandable. Such resentment, however, did not stem from the fact that these drivers participated in concerted activities. The meeting-party at Hale's house over two months before the discharges had nothing to do with Kempner's selecting the three men he dismissed. Since six drivers were at the meeting and Kempner knew nothing of the details of the discussion which took place there,[3] the discharges can hardly be traced or attributed to that party. The actual decision to discharge the men was made by Fant and V. I. Martin because of the failure of the drivers to work effectively with the man in charge of trucking operations at the Greensboro plant and not for any reason proscribed by the Act.

■ It is apparent from the record that Kempner had a rather unpleasant disposition and was difficult to work with. It is also clear that Hale invited appeals to him over Kempner's orders if the drivers objected to such orders. Under these circumstances, perhaps the Company's top management would have been wiser in discharging Kempner instead of the drivers, but neither the Board nor this court is empowered to dictate to businessmen how they should conduct their labor affairs so long as the Act is not violated. See N. L. R. B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45–46, 57 S.Ct. 615, 628, 81 L.Ed. 893 (1937). The conduct which is the subject of the Board's order in this case may have been unwise, but it was not illegal.

As this court pointed out in Joanna Cotton Mills Co. v. N. L. R. B., 176 F.2d 749, 753 (4th Cir. 1949):

"* * * We must not forget that the National Labor Relations Act 'does not interfere with the normal exercise of the right of the employer

---

3. Kempner said he knew nothing about the meeting except that it took place and that some of the drivers drank too much of intoxicating beverages. He said he assumed that Hale would tell him anything he needed to know about the meeting. Hale told him nothing, according to the testimony.

to select its employees or to discharge them'; that the employer 'may not, under cover of that right, intimidate or coerce its employees with respect to their self-organization and representation, and, on the other hand, the Board is not entitled to make its authority a pretext for interference with the right of discharge when that right is exercised for other reasons than such intimidation and coercion.' N. L. R. B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 46, 57 S.Ct. 615, 628, 81 L.Ed. 893, * * * N. L. R. B. v. Fansteel Corp., 306 U.S. 240, 254, 59 S.Ct. 490, 83 L.Ed. 627 * * *.''

We have examined the "concerted-activity" cases cited in the Board's brief and find them so clearly distinguishable on their facts that we need not discuss them. Indeed, there is no claim that there is supporting authority based upon facts similar to those here.

Enforcement denied.