## OWENS–ILLINOIS GLASS CO. v. NATIONAL LABOR RELATIONS BOARD.

### No. 8707.

Circuit Court of Appeals, Sixth Circuit.

Dec. 2, 1941.

Charles W. Racine, of Toledo, Ohio (Williams, Eversman & Morgan, Henry A. Middleton, Charles W. Racine, Alfred C. Hirth, and John L. Gushman, all of Toledo, Ohio, on the brief), for petitioner.

Robert Kleeb, of Washington, D. C. (Robert B. Watts, Laurence A. Knapp, Ernest A. Gross, Richard C. Barrett, and Frank Donner, all of Washington, D. C., on the brief), for respondent.

Before SIMONS, ALLEN, and HAMILTON, Circuit Judges.

HAMILTON, Circuit Judge (dissenting).

Petition by the Owens-Illinois Glass Company to review and set aside an order of the National Labor Relations Board, issued pursuant to Section 10(c) of the National Labor Relations Act (49 Stat. 449; 29 U.S.C.A. § 151, et seq.) and also petition per contra of the Board for the enforcement of its order.

The order complained of directs petitioner to cease and desist from discouraging membership in the Federation of Flat Glass Workers of America, or any other labor organization, of its employees by discriminating in regard to their hire and tenure of employment, or any terms or conditions of employment, or in any other manner interfering with, restraining, or coercing, its employees in the exercise of their right to self-organization and other rights guaranteed under Section 7 of the Act;

Also to reinstate four employees without prejudice to their seniority and other rights and privileges and to make whole those four employees and also seven other employees for any loss of pay they may have suffered by reason of discrimination in regard to their hire and tenure of employment, less their respective net earnings and also less monies received by them on work relief projects, the latter to be repaid to the proper governmental agency;

Also post and maintain for a period of sixty consecutive days at its plant at Fairmont, West Virginia, notice to its employees that petitioner will not engage in the conduct from which it is ordered to cease and desist, and will take affirmative action regarding the rehiring and reimbursing of the employees affected and that all its employees are free to become or remain members of the Federation of Flat Glass Workers of America, and that petitioner will not discriminate against any employee because of membership or activity in the organization;

Also notify the Regional Director within ten days from the date of the order of the steps taken to comply therewith.

Petitioner is an Ohio corporation having six wholly-owned subsidiaries in Delaware, Ohio, Oklahoma and Massachusetts, and with plants in Illinois, Indiana, New Jersey, Ohio, Pennsylvania and West Virginia and is engaged at Fairmont, West Virginia, in the manufacture and sale of glass containers.

The primary question for determination is whether the Board's order is supported by substantial evidence.

The National Labor Relations Act, by its terms, provides the findings of the Board as to the facts, if supported by evidence, shall be conclusive, 49 Stat. 449, 453, Sec. 10(e), 29 U.S.C.A. Sec. 160(e). However, in applying the statute, the evidence relied on by the Board must be more than a mere scintilla. It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consoli-

dated Edison Company v. National Labor Relations Board, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L.Ed. 126.

In reviewing the substantiality of evidence to support the Board's order, the court follows in principle the long-recognized rule applied in determining the sufficiency of the evidence to submit a law action to a jury. National Labor Relations Board v. Columbia Enameling & Stamping Company, 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660.

This proposition is not merely whether there is any evidence to support the Board's order, but the responsibility rests on the court to review the evidence as a whole and acting judicially, to determine whether or not there are facts in evidence, or fair inferences to be drawn therefrom which, if unanswered, would justify men of ordinary reason and fairness in affirming the issue which complainant is bound to maintain. The Board is the sole judge of the sufficiency of the evidence in fact; the court is the sole judge of its sufficiency in law. If this were not so, the power to determine questions of law, as well as questions of fact, would be lodged in the Board and the statutory right of review by the court would be a nugatory power.

This is a matter of importance for the subject of judicial review of the Board's orders is material to the philosophy of the act. National Labor Relations Board v. Thompson Products, Inc,, 6 Cir., 97 F.2d 13. Our industrial system maintains itself and develops only where great numbers of men work in peace together for common ends. With this object in view the National Labor Relations Act conferred on employees the right to organize and bargain collectively free from interference, restraint or coercion of the employer, but the purpose of the act is not accomplished by subjecting either the employer or employee to external regimentation. Compare National Labor Relations Board v. Jones & Laughlin, Steel Corp., 301 U.S. 1, 45, 57 S. Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. The National Labor Relations Act envisages that the entire matter of a hearing between the parties shall be carried on before an impartial examiner under the general supervision and control of the members of the Board and that the truth as to the facts shall be arrived at upon a consideration of the entire evidence and proof presented by the respective parties in support of their claims. It is fundamental that an issue arising between the employer and employee must be tried by a general, rational, or reasoning process both as to the ascertainment of facts and the application of the law. The existence or nonexistence of ultimate issuable facts must be determined from the whole evidence produced and whether the determination is made by the Board or the court it must be by a process of rationalization and judgment and by the application of the thinking faculties of the human mind to the whole mass of evidence.

The testimony of a single witness should not be weighed to the exclusion of that of other witnesses or other evidence on the same subject matter. Peninsular & Occidental S. S. Co. v. N. L. R. B., 5 Cir., 98 F.2d 411. There are always present peculiar conditions and circumstances which influence the deeds and color the words of men. No fair appraisal can be made of evidence without taking into consideration all of the surrounding facts and circumstances admitted or proven in any case. Where there is a seeming conflict of evidence or inferences to be drawn therefrom, the trier of the facts has the duty to scrutinize them carefully to ascertain whether susceptible of explanation or incapable of being reconciled.

If, by the application of their intellectual processes, reasonable minds could arrive at but one conclusion from the whole of the evidence and the inferences to be drawn therefrom, then the question as to whether the complainant, having the burden of proof, has established the issuable facts in the particular case is one to be decided by the court. If, on the other hand, different conclusions may be drawn from the evidence any one of which supports the order of the Board, the court lacks the power to set aside the Board's order even though the reviewing court would reach a different conclusion on the facts. If the proof offered before the Board in support of the existence of the ultimate issuable fact is so meager that a reasonable mind could not therefrom arrive at the existence of the ultimate fact, the Board's order must be denied for lack of substantial evidence to support it. The credibility of witnesses, even though wicked and depraved, is for the Board and if the Board believes them, the appellate court is without power to declare them unworthy of credit or belief.

With these general observations, resort must be had to a consideration of the facts

to answer the questions at issue. It is the duty of the court to consider the evidence in the light of labor conditions prevailing in petitioner's plant at the time of the alleged violations. Martel Mills Corporation v. National Labor Relations Board, 4 Cir., 114 F.2d 624.

For many years before July 6, 1937, operators of the bottle machines in petitioner's plant were within the jurisdiction and members of the Glass Blowers Association, an affiliate of the American Federation of Labor and employees in its central mold shop and its mold repair department were members of the American Flint Glass Workers Union, also affiliated with the American Federation of Labor. The evidence shows that petitioner had entered into employees' agreements with these unions and that all of the officials of petitioner, including its plant managers, had been fair in their dealings with these organized employees. Prior to July 6, 1937, the American Federation of Labor and the Congress of Industrial Organization commenced a campaign for organization among petitioner's unorganized employees, and on July 6, 1937, a meeting of some of them was held at Fairmont, West Virginia, for organization purposes. Temporary officers of a local union were elected at this meeting and on July 31st of the same year, a charter was issued by the American Federation of Labor to Local No. 55, Flat Glass Workers of America, an affiliate. On August 15, 1937, the Congress of Industrial Organization displaced the American Federation of Labor and issued its charter to Local No. 55, which thereafter became its affiliate. On February 4, 1938, the American Federation of Labor officially revoked its charter with the local and thereafter some of petitioner's employees continued with the local as an affiliate of the Congress of Industrial Organization.

Immediately after the July 6th meeting, discontent and dissent arose among petitioner's employees concerning the union, some of them being ardently in favor of the union, others violently opposed to it. A schism occurred among the employees in petitioner's plant by reason of this controversy, which resulted in much discussion of the union during working hours, some employees openly declaring their fealty, others their opposition to, and impatience with the method of organizing, concert of action among them becoming seemingly impossible. Some of the minor employees sought the advice of petitioner's supervisory employees and as a result, a prying attitude as to the union and its activities developed with the supervisory employees with a concomitant spirit of criticism as to its effect on the employees generally.

Walter Brand, superintendent of petitioner's packing department, inquired of some of the employees under his supervision if they had attended the union meeting and signed application cards, and when one employee told him he had, Brand replied "why do you wish to tie yourself up with a bunch of Dagoes and Reds when your company will do as much and more than the unions. They mean to take your money." He also advised this employee to do nothing for which he would be sorry later. Brand called two other employees into his office and showed them newspapers with pictures of fighting among strikers and employees at other places where strikes had occurred. He told them of people being killed in strikes conducted by the C. I. O. and that strikes forced people to go on relief and subsist on "baked beans and sow belly." Brand advised these employees there was no need for an outside organization in the plant and stated the company was doing all it could to help its employees. He told them they were free to join or not join the union but advised them to do nothing for which they would be sorry.

Brand also told another employee, a member of the union's policy and organization committee, that she must stop soliciting union memberships during working hours and among employees who were at work, because of the distraction and controversy which ensued. He stated to this employee that she was on probation and if she didn't stop soliciting on the lehrs [1] she would be out of a job sooner or later. He instructed four shift foremen to check up on union membership among the employees and report to him, that there was some "cleaning up" to be done and they all knew what to do, but not go too fast at first. Brand kept a record of employees who were members of the union and their attendance at union

---

[1] The lehrs are annealing ovens which temper and cool the ware as it leaves the bottling machines and is carried on a continuous conveyor until ready for inspection and packing.

meetings. He also instructed Amer Hall, a boss packer, to find out all he could about the union from Gladys Wilson, its recording secretary and an employee of the petitioner. Hall questioned this employee, who declined to give him any information.

Ray Burchett, superintendent of the shipping and storage department, at a shift meeting of that department at which disorders were discussed, said he didn't know how many employees had signed union cards, but supposed most of them had done so. He stated to the employees present that in his opinion the union could do nothing for them that petitioner would not voluntarily do and that all the union wanted was dues and if the employees thought they were entitled to higher wages, it was not necessary to join a union to get them. Burchett added there were hundreds of ways to get rid of men and that he pitied those who had signed up with the union. He stated to another employee that petitioner would never recognize a C. I. O. union and that the employees at six or seven of petitioner's other plants had voted down the C. I. O. as a bargaining agency. He advised the employees they would have to use their own judgment about joining the union, and should investigate the whole thing and act on their own initiative. At the time these statements were made there was turmoil in his department and its efficiency had greatly decreased, all of which Burchett stated was caused by the difference of opinion among the employees about the advisability of joining the union and the discussions among them during working hours on that subject.

Homer Haney, a tractor driver in Burchett's department, was elected temporary treasurer of the union at the July 6th meeting. On July 14th, after Burchett had made his statement to some of the employees about the union, Haney went to him and said he was through with the union. He testified that Burchett had nothing to do with his withdrawal from the union, but that he left it because he didn't like it and he told Burchett about his withdrawal because he was his boss.

On August 5, 1937, David Denelsbach, petitioner's plant manager at a meeting of departmental heads, discussed the cost of operations during the first six months of 1937 and stated that in petitioner's shipping department at Fairmont, West Virginia, the costs were much higher than in its plants at other locations and that something must be done about it. The following day Jay Garlow, who was temporarily acting for Burchett, called into his office Francis Daugherty and told him something was wrong in the shipping department; that out of thirty attending the last union meeting about twenty were from his department and also discussed with him the disorderly conditions in that department. Daugherty, who was active in the union, charged that Garlow singled him out because of that activity and at this meeting the two of them got into a heated argument about the desirability of the C. I. O. as a bargaining representative. In the course of this conversation Daugherty testifies Garlow told him the petitioner would never recognize the C. I. O. as a bargaining agency and that there were hundreds of ways of getting rid of men the petitioner did not want; that it might take a year to do so, and that it would not be marked up in the record in the personnel file for joining the C. I. O. but their dismissal would be for that reason. Garlow told Daugherty that if he wanted to join the union, it was his business and that he could transfer him to either one of the two departments already unionized if he wished. Daugherty stated he liked his present position and was not interested in a transfer. Garlow testified the packing department was in a furore at that time and the employees were huddled together spending their time discussing the union and as a consequence the department was running behind in its work, resulting in demoralization of petitioner's business.

About the middle of July, 1937, I. W. Reese, head of the maintenance department, in talking to employees there stated that he was speaking for himself only, but that in his opinion, the C. I. O. was made up of a bunch of Reds and radicals working only for their own good and that petitioner's employees who had joined the union had made a big mistake and he hoped no more would sign up and that before petitioner would recognize the union, it would close the plant and move elsewhere.

Raymond Casseday, petitioner's personnel director, in a conversation with James Shaffer, who had been laid off and had applied to him for re-employment at which time they discussed the union, told Shaffer if he would attend union meetings and keep him informed as to what was going

on, he would get his job back, but Shaffer declined to accept this suggestion. Casseday had no supervision over Shaffer.

Anthony Laratta, a union member, testified he was laid off by petitioner September 17, 1937, at which time he was working on No. 12 lehr of furnace 6 which closed down. Two days later Brand sent for him and told him that at any .time he had a grievance, he should see the people who were interested in him and at Brand's suggestion he was re-employed in the maintenance department doing brick laying, until November 20th at which time he was laid off because the tank he was working on was completed and there was no further work for him to do. During this period Brand came to see him several times. In this connection Laratta testified as follows:

"Q. During that period of time you worked as a brick layer did Walter Brand on any occasion discuss the union with you down in the maintenance department? A. No, he didn't discuss no union. He come over to see me. * * *

"Q. What did Brand come over to see you about? A. Well, he just come over to see me. I was going to meetings, union meetings, and I don't know whether I got the right idea or not, but I think . . .

"Q. (By Mr. Kleeb.) I want to know what Brand said to you when he came over to see you. * * * A. Well, I don't think there is any union or meetings or organizations that has secrets * * * and I didn't have any in that union either. So I talked union with him and told him a lot of things I didn't like over there and still don't like and with some he just nodded his head and never said nothing about them, but he just listened and I talked. * * * Well, he would say 'How are you getting along and what are they doing over there?' And of course I would just start out with my union activities and talk about them."

Laratta was recalled to work in April and Brand offered him a gluing job on the lehr at 58 cents an hour and Laratta told him he couldn't come back at that price, that he had a job which was paying him 75 cents an hour and Brand told him he thought he had made the right decision. Laratta was making 66 cents an hour on his former job with petitioner which was abolished between his lay-off and tendered re-employment.

The foregoing is a fair résumé of the testimony on which the Board relies as substantial evidence that petitioner was engaging in unfair labor practices within the meaning of Section 8(1) of the Act. 29 U.S.C.A. § 158 (1), 49 Stat. 452.

It is the duty of the Circuit Court of Appeals, before entering a decree enforcing an order of the Board, to decide from a consideration of the pleadings, testimony and proceedings set forth in the transcript filed by the Board whether the employer has "interfered with, restrained or coerced his employees" as that phrase is ordinarily understood, in the exercise of any rights guaranteed to them under Section 7 of the Act. Sec. 10(e, f), 49 Stat. 453.

Since Congress has invoked the exercise of the supervisory power of the Circuit Courts of Appeal before orders of the Board can be enforced, it would seem to follow that such power is the usual power exercised by those courts when reviewing the orders of similar administrative boards such as the Federal Trade Commission. It is clear from the statute that Congress meant to invoke some supervisory power precedent to the Board enforcing its orders and unless that invoked jurisdiction submitted to the judgment of the court the legal question as to whether the facts in the record established that the employer had interfered with, coerced or restrained his employees, then the question may be well asked, what supervisory power did the Congress confer on the Circuit Court of Appeals, for if it is not a substantial one and judicial in its nature, then it is manifest that it is only a shadow. Any other interpretation would make of the court a shield for the Board by which, in its hearing, it could ignore pertinent evidence and raise to the dignity of substantial evidence that which is in reality only a scintilla of proof. Federal Trade Commission v. Curtis Pub. Company, 260 U.S. 568, 580, 43 S.Ct. 210, 67 L.Ed. 408.

Where the decision of the Board is clearly wrong even upon a question of fact, it may be set aside under the power conferred on the Circuit Court of Appeals by the statute. Commercial Mutual Accident Company v. Davis, 213 U.S. 245, 256, 29 S.Ct. 445, 53 L.Ed. 782.

The petitioner urges on us that the Board in its hearing assumed it to be improper for an employer to converse with his employees respecting union matters

or to indicate to them that as an employer he was not in favor of union organization. It is claimed that this is contrary to the spirit of the National Labor Relations Act and if not that the constitutional right of free speech guaranteed the employer is violated. The applicable rule is set forth in Texas & New Orleans Railroad Company v. Brotherhood of Railroad & S. S. Clerks, 281 U.S. 548, 568, 50 S.Ct. 427, 433, 74 L.Ed. 1034, in which case the court had under consideration a provision of the Railway Labor Act, 45 U.S.C.A. § 151 et seq. to the effect that representatives of employees should be designated without interference, influence or coercion from the employer. The court there said: "The intent of Congress is clear with respect to the sort of conduct that is prohibited. 'Interference' with freedom of action and 'coercion' refer to well-understood concepts of the law. The meaning of the word 'influence' in this clause may be gathered from the context. Noscitur a sociis. [State of] Virginia v. [State of] Tennessee, 148 U.S. 503, 519, 13 S.Ct. 728, 37 L.Ed. 537. The use of the word is not to be taken as interdicting the normal relations and innocent communications which are a part of all friendly intercourse, albeit between employer and employee. 'Influence' in this context plainly means pressure, the use of the authority or power of either party to induce action by the other in derogation of what the statute calls 'self-organization.' The phrase covers the abuse of relation or opportunity so as to corrupt or override the will, and it is no more difficult to appraise conduct of this sort in connection with the selection of representatives for the purposes of this act than in relation to well-known applications of the law with respect to fraud, duress, and undue influence."

The distinction between the exercise by an employer of the right of freedom of speech and the use of words or conduct for the purpose of overpowering the will of his employees is well understood and defines the limits of the rights of the employer. The application of this concept is often difficult and where there is room for conflicting inferences, the trier of the facts has the discretion of determination. There is a limit under the National Labor Relations Act to interference with the individual independence of the employer and the court has the duty to find that limit and maintain it against encroachment as well as the duty to give to the act such liberal construction as will carry out its remedial purposes, namely, to prevent the employer from interfering with, restraining or coercing employees in their rights guaranteed under the act.

To establish interference, restraint or coercion of employees by the employer, it it is not necessary that there be direct testimony that threats were made or even persistent entreaty or persuasion brought to bear upon the minds of the employees. It is sufficient if from all the surrounding circumstances it appears that the employer has exercised such influence over his employees as to subject their will to his to such an extent that their minds are overcome and confused, without convincing their judgment.

The petitioner is bound by the acts and declarations of its supervisory employees. Such employees carry the responsibility of the employer although they would not bind him under the doctrine of respondeat superior, International Association M. T. D. M. L. v. N. L. R. B., 311 U.S. 72, 80, 61 S.Ct. 83, 85 L.Ed. 50; H. J. Heinz Company v. N. L. R. B., 311 U.S. 514, 520, 61 S.Ct. 320, 85 L.Ed. 309; National Labor Relations Board v. Link-Belt Company, 311 U.S. 584, 599, 61 S.Ct. 358, 85 L.Ed. 368. Interference by supervisory employees is the equivalent of interference by the employer himself.

The question for decision here is whether the acts and declarations of petitioner's supervisory employees were of such magnitude and under such circumstances as to impose an involuntary restraint on the will of the employees which prevented them from doing what they wished to do or forced them to do what they did not desire to do with reference to the organization of the union.

The National Labor Relations Act intended to make employees free agents in self-organization. This right, free from restraint or intimidation by the employer, has been so long recognized and the National Labor Relations Act guaranteeing this right so long in effect that it must be assumed the employees were fully aware of their rights and the burden of coercion from the employer is not presumed, but is an issue to be affirmatively established by substantial evidence. Persuasion, solicitation, importunity, request, advice or argument on the part of supervisory employees, no more appearing, does not violate the act. In weighing the sufficiency

of evidence to support a decision of the Board, the position held by the employee undertaking to persuade another employee of inferior position is of importance.

Excluding the present statements of some of the petitioner's supervisory employees at its Fairmont, Virginia, plant, the record shows that petitioner was not unfriendly to organized labor and that it had not carried on a campaign of hostility towards unions nor practiced espionage in relation to the organization of its employees. The employers' attitude towards unions is relevant in determining the sufficiency of evidence to support the Board's order. National Labor Relations Board v. Link-Belt Company, 311 U.S. 584, 588, 61 S.Ct. 358, 85 L.Ed. 368.

The undisputed evidence shows that immediately after the first organization meeting of petitioner's employees, unrest sprang up in some departments of its plant and that, instead of working steadily, many of its employees gathered during working hours into small groups to discuss labor conditions generally and the proposed organization in particular with much solicitation by some for others to join the union with the result that the efficiency of employees was lessened and production fell off. Bad feeling was engendered among the employees in the plant.

The supervisory employees were disturbed about these conditions and undertook to remedy them. The average mind fairly familiar with human activity in business affairs would expect, under the circumstances above outlined, to find supervisory employees making an effort to understand and correct conditions which caused unrest and dissension in their plant, and · such efforts would necessarily call for inquiry and a certain degree of watchfulness to discover the underlying trouble. It would follow that an effort to correct conditions would be made. It would also be expected under such circumstances that some derogatory statements would more than likely be made concerning the particular union which motivated the controversy resulting in inefficiency in the plant. There is no substantial evidence that the statements of petitioner's supervisory employees had the slightest effect in decreasing membership in the union.

Giving due weight to the normal and actual effect of the supervisory employees' statements, these statements did not influence the employees against their will to stay out of the proposed labor organization and the Board was not justified in finding that those statements alone constituted an unfair labor practice. Jefferson Electric Company v. N. L. R. B., 7 Cir., 102 F.2d 949; National Labor Relations Board v. National Motor Bearing Company, 9 Cir., 105 F.2d 652; National Labor Relations Board v. Whittier Mills Co., 5 Cir., 111 F.2d 474; Midland Steel Products Company v. N. L. R. B., 6 Cir., 113 F.2d 800; National Labor Relations Board v. Mathieson Alkali Works, 4 Cir., 114 F.2d 796; Quaker State Oil Refining Corporation v. N. L. R. B., 3 Cir., 119 F.2d 631; National Labor Relations Board v. Empire Furniture Company, 6 Cir., 107 F.2d 92.

The National Labor Relations Act does not prohibit the right of opinion on the part of the employer concerning union organization nor does it prevent him from giving expression to that opinion. Consolidated Edison Company v. National Labor Relations Board, 305 U.S. 197, 230, 59 S.Ct. 206, 83 L.Ed. 126; National Labor Relations Board v. Ford, 6 Cir., 114 F.2d 905.

The Board decided that petitioner discriminated as to the hire and tenure of employment of eleven employees in violation of Section 8(3) of the Act, 49 Stat. 452, 29 U.S.C.A. § 158(3). It found petitioner had laid off eleven employees in order to discourage membership in the union, nine of whom were employed in its packing department and the other two in the shipping department.

Petitioner's Fairmont plant operated on a seasonal basis with a decline in business usually in the fall. However, during the fall of 1936 and the winters of that year and 1937, the customary decline in business failed to occur. The peak of employment in petitioner's plant was reached in March, 1937, when there were 1,537 employees with 973 of them in the glass house section. During the early summer of 1937, petitioner was unable to fill promptly all of its orders and for this reason kept in its service some inefficient employees. Late in the summer of that year, a sudden and unexpected slump occurred generally in the glass container industry and as a result business at petitioner's Fairmont plant fell off to such an extent that it was necessary to dispense with the services of 101 employees. Orders continued to decrease and between September, 1937, and September, 1938, the number of glass house employees

declined 57%. Among the employees laid off were eleven whom the Board found were discharged for the purpose of discouraging membership in the Federation of Flat Glass Workers of America. Although the Board found it was necessary to discharge this number of employees, it finds others should have been selected.

Prior to these lay-offs, petitioner was operating six furnaces, each of which served two annealing lehrs, which were from 75 to 100 feet long and the packing department employees worked at the end of the lehrs, discarding defective ware and selecting and packing the finished perfect ware. Usually from three to four women, called selectors, worked at each lehr and packed the selected bottles in paper cartons or placed them on racks. It was necessary for the selectors to give close attention to their work because as many as 78 different defects could appear on each bottle, any one of which required its rejection. A man attendant supervised each lehr for the purpose of seeing that their inspecting tables were clear and orderly and that the selectors performed their work efficiently. The selectors were shifted to different lehrs every few days. The attendant usually worked regularly on a particular lehr. Before the present lay-offs, an average of 184 women and 80 men were employed in petitioner's packing department. On September 17, 1937, furnace No. 6, which served lehrs numbers 11 and 12, shut down because of the decline in orders. This necessitated the laying off of all the selectors and attendants on these lehrs, twenty-four women and eight men.

Wallace Smouse, shift foreman in the packing department, recommended in writing to W. L. Brand, superintendent of that department, the names of some of the employees who should be laid off because of the closing of the furnace, among whom were complainants, Lena Anselene, Edith Gallion, Joseph Schnell and Anthony Laratta. The reason he gave for dispensing with the services of Anselene was because she was not truthful or dependable and had attempted to coerce some of the people on her shift to join the union by telling them falsehoods. He stated Gallion should be furloughed because she was continually laying off six or seven days at a stretch "without any good reason whatever" and listed the days she had been absent; that Schnell had a "non-cooperative attitude and objected to everything that was done or suggested; also his wife was working on the same shift." The reason given for dispensing with Laratta's services was that he "was somewhat dissatisfied with his raise and evidently he is a bricklayer and I thought probably he could secure a job as a bricklayer."

The subject of this action was considered at a previous Board hearing, the findings of the trial examiner set aside in a review by the Board and a rehearing ordered. At the first hearing Smouse was a witness on petitioner's behalf and amplified the above reasons for the lay-offs.

Between the first and second hearings, Smouse was demoted from the position of shift foreman to that of lehr inspector, resulting in decreased pay from $200 to $110 per month, after which he went to the attorney for the Board and advised him he had sworn falsely at the first hearing. He continued in the confidence of petitioner's attorney until put on the stand, when he testified that on September 12, 1937, Brand came to his house and gave him a list of employees whom he desired laid off and told Smouse he wanted him to do it, and to prepare reasons for their lay-offs other than their union affiliation. He stated that he carried out Brand's request and on September 13th submitted the list to Brand who deemed the reasons given insufficient and they jointly prepared revised reasons which are as enumerated above. All of this was contrary to his testimony in the former hearing.

At the present hearing, on being asked who selected the employees to be laid off on his shift, Smouse first testified he used his own judgment. After a night's adjournment of the hearing he came back to the witness stand next day and said he was mistaken as to his previous day's testimony and that the employees laid off were selected by Brand. Smouse, at the present hearing, for the first time also testified that in August, 1937, Brand told him that furnace No. 6 would be the first one shut down when production orders fell off and that he and other foremen were to transfer from other furnaces to lehrs 11 and 12 serving that furnace, employees who were known to be union members, which would be a convenient way to get rid of such employees without having it appear they were laid off because of union activity.

The Board found, on the testimony of Smouse, that some of the employees of petitioner who were union members and

transferred to lehrs 11 and 12 were laid off to discourage membership in the Federation of Flat Glass Workers of America. Petitioner urges on us that the maxim falsus in uno, falsus in omnibus is applicable to the testimony of Smouse and that it is our duty to reject it in its entirety. The rule stated in the maxim is applicable, but is one of permission and not mandatory. The Board would have been fully justified in disregarding the testimony of Smouse, but was not bound to do so. The question is one of credibility of witnesses, not their competence. The use of his testimony as an instrumentality in the pursuit of truth has little appeal to this writer, but if the Board wishes to rely on the testimony of this willful falsifier, we cannot disregard it. The credibility of Smouse is somewhat bolstered by the failure of petitioner to call as a witness Brand, who was available. "All evidence is to be weighed according to the proof which it was in the power of one side to have introduced and in the power of the other to have contradicted."

Giving the same weight to Smouse's testimony, as did the Board, which the court must, does not require the conclusion that the Board's order in this particular is supported by substantial evidence, if uncontradicted evidence in the record and irrefutable inferences therefrom show that Smouse's testimony must be cast side.

David Denelsbach, manager of petitioner's Fairmont plant, testified that petitioner operated six furnaces, each capable of producing different colored glass and they were numbered from one to six, the latter serving lehrs Nos. 11 and 12 and producing flint or clear glass and that on August 17, 1937, there were on hand orders for this glass which would take eleven and one-half weeks to make. He also testified that when the flint beverage business commenced to decrease in the late summer, the catsup and tomato juice flint orders increased. The witness further stated that in the middle of August 1937, cancellations came in on flint sodas and as petitioner was anxious to keep the flint furnaces up, he immediately requested orders for flint from other plants of the petitioner which were received and on the last day of August they were running at the rate of 10,000 gross per week, at which time there was no indication it would be necessary to close the flint furnaces but, because of the unexpected failure of the tomato crop that year, the catsup bottle orders began to decline in early September and by the week of September 20th, they were all filled and that he first knew about September 12th that one of the flint furnaces would go down.

This witness also testified that glass furnaces wear out and must be closed and repaired about every fifteen or twenty months and the longer they operate the poorer their condition became. He further testified that flint glass furnace No. 6 was in the poorest state of repair. He said he was the only person who knew what furnace was to be shut down and that he couldn't definitely advise the department heads it would shut down more than twenty-four hours before its closing. He said, however, he did know about a week before that if flint business did not increase, it would be necessary to close it down. The witness stated he had furnished information to no one in August that any flint furnace would close down and that all during August orders on hand were sufficient to keep all the flint furnaces operating. Denelsbach's testimony was supported by petitioner's bookkeeping records.

The Board, following its customary practice, mingles in its decision statements of witnesses and expressions of opinion. No reference is made therein to the testimony of Denelsbach, which it is to be presumed the Board overlooked in the weighing of Smouse's testimony.

Howard Glasscock, Rex Henderson and Roy Davis, all of whom the Board found were openly and actively for the union, were transferred from lehrs serving No. 6 furnace to lehrs serving other furnaces which did not shut down, and these transfers were made at the same time Smouse claims he made transfers of employees because of their union activity.

When the testimony of Smouse is weighed in connection with that of other witnesses on the same subject matter, there is no more than a scintilla of evidence that petitioner transferred employees to lehrs 11 and 12 of furnace 6 for the purpose of later laying them off due to union activities.

The National Labor Relations Act does not interfere with the normal exercise of the right of the employer to select or discharge employees. Associated Press v. N. L. R. B., 301 U.S. 103, 132, 57 S.Ct. 650, 81 L.Ed. 953. The existence of a cause for the discharge of an employee in the exercise of

reasonable judgment in the management of a business and not a purely capricious act, is of importance where there is a charge of discrimination against the employer because of the employees' union activities. While ordinarily an employer may discharge employees without reason, the absence of a reason in connection with other circumstances may point strongly to a discrimination forbidden by the National Labor Relations Act.

Even if a valid and sufficient reason for discharge exists, the real or motivating reason may be because of the employees' union activities, but where a good and valid reason exists, strong and convincing evidence must be produced to show that the discharge was in violation of the Act, otherwise the statute would become a shield for inefficient and unsatisfactory employees.

No rule of seniority prevailed in petitioner's plant, but the broad rule followed was to keep in service the most efficient and this was shaded in application by age, physical condition, versatility, residence, marital status and length of service. When lay-offs were imperative, selections were almost entirely within the discretion of the department head or foreman.

The facts as to each complainant will now be considered. Lena Anselene was first employed by petitioner in 1927 as selector in the packing department; was laid off for about two months and called back in January, 1928; was laid off again in December, 1928, called back in January, 1929 and worked steadily thereafter until September 17, 1937. She joined the union July 12, 1937, and was thereafter active in its organization, serving on the policy and organizing committees, canvassing employees at their homes and while they were at work and passing out union application cards to co-employees during working hours. She was one of the complainants transferred to lehrs 11 and 12, furnace 6. The Board found "that excessive talking by selectors while working on the lehrs is not a desirable condition, inasmuch as inspecting ware requires close attention in order to detect defects, which if passed might have serious consequences to anyone using the defective bottles." The complainant testified she talked about the union in the dressing room, during lulls in work and before and after working hours, but denied talking while working on the lehrs; however, several employees testified she talked unduly while working on the lehrs and interfered with their work. The Board found she was a violator of the rule against talking on the lehrs, but concluded she was not an outstanding one.

The Board has no power to excuse an employee for violating a reasonable rule of his employer and we think petitioner was justified in selecting Miss Anselene as one of those to be laid off. The Board's order as to her is without substantial evidence.

Complainant, Edith Gallion, was first employed by petitioner in 1921; laid off in 1925 and re-employed in September, 1933, and laid off September 17, 1937. She joined the union on July 19, 1937, and attended two or three meetings prior to her lay-off. She was not active in organization work, but Smouse, her foreman, knew she belonged to the union. The uncontradicted evidence shows that this complainant would absent herself without notice to her employer for six or seven days at a time and that Smouse had reprimanded her several times for this practice. Plant manager, Beishline, who succeeded Denelsbach, testified that Mrs. Gallion was very uninterested in her work, very irregular in her attendance, worked poorly with others and did not fit into the organization. The Board found she was frequently absent from her work, but without any evidence to support its conclusion stated "there is no evidence that Gallion's absence from work on any of the days mentioned in Smouse's memorandum was without permission or against instructions." Smouse testified to the contrary and his testimony was supported by Edith Donlin, who worked with complainant. Petitioner was justified in selecting Mrs. Gallion to be laid off and the Board's order as to her is without substantial evidence.

Complainant, Flossie Stemple, was first employed by petitioner at its Fairmont plant in November, 1934, in the repack department and transferred to the packing department in the spring of 1935 as selector and continued in that capacity until laid off in September, 1937. She joined the union July 24, 1937, and thereafter attended union meetings, passed out a number of application cards and signed up four co-employees. After she had joined the union, superintendent Brand addressed a question to a group of employees, of which she was a member, as to what time they were meeting the following day at the Labor Temple. She was transferred to lehr 11 by her foreman, Paige, about three weeks or a month before furnace No. 6 shut down, at which time she was

laid off. She was re-employed in petitioner's decorating department for ten days beginning April 4, 1938, and again for two weeks in May, 1938, and re-employed in the packing department April 16, 1939, where she worked until June 21, 1939. The Board seemingly bases its decision as to this complainant on the fact that she was transferred to lehr No. 11 and the further fact that she was one of the oldest employees in point of service in the department and that petitioner gave no satisfactory reason for laying her off.

Complainant did not sustain the burden, which was on her, to show she was laid off because of union activity, and there is no substantial evidence to sustain the Board's order as to her.

June Tennant was first employed by petitioner in June, 1935, in the repacking department, then transferred to the packing department as a selector where she worked until June, 1936, when discharged for carelessness; was rehired in September, 1936, as a selector and worked until September 17, 1937, when laid off. This complainant had been transferred to lehr 11 about five weeks before her lay-off at which time she was married and her husband working. Immediately following her lay-off she suggested to co-workers, who had been laid off also, that they sign a union card, date it back several months and claim they had been discharged because of membership in the union. The Board bases its decision as to this complainant on the fact that she belonged to the union and was transferred to one of the lehrs served by furnace 6 and the further fact that she was senior in service to some of the employees retained. As heretofore pointed out and the Board so found, petitioner had no fixed seniority rule. The records relied on by the Board show there were 144 employees of longer service than complainant. She admits that on one occasion she remained away from work without notice to petitioner. She was re-employed May 1, 1939, as a selector and was working at the time of the hearing. The uncontradicted evidence shows complainant was what might be called a marginal employee whose services would be used at peak employment, but who likely would be laid off in periods of decreased activity. The Board's order as to her lacks substantial evidence.

Complainant Nick Balseto was first employed by petitioner's predecessor in 1912 and worked until 1915, when he voluntarily quit. He again entered the service of petitioner in 1922 and worked at times as a selector, at other times as a lehr attendant. He was transferred to lehr 12 about August 26th and laid off September 17th. Complainant joined the union July 6, 1937, and was elected financial secretary August 19th of that year. He attended all organization meetings, was an active union worker and canvassed all the employees in the plant for union membership. The uncontradicted evidence shows he was argumentative and indulged in mean and nasty remarks to any of his co-workers who disagreed with him about the union organization. Several women employees testified, without contradiction, that complainant's conduct toward them while under his supervision was so disagreeable and abusive it made them nervous and interfered with their work. The Board based its decision largely on the fact that Balseto's union activities were known to petitioner's supervisory employees and that he was transferred to lehr No. 12 for the purpose of laying him off. To sustain the Board's order on the evidence in this record would be to permit it to substitute its opinion and judgment for that of the management in the conduct of petitioner's business. The record is replete with uncontradicted evidence of this complainant's ugly and disagreeable attitude toward the women selectors who were partially under his supervision both as to their work and their indifference to the union. The Board's order as to this complainant is not supported by substantial evidence.

Complainant Lester Henderson was employed by petitioner in 1923 and worked as a lehr attendant in the packing department until laid off September 17, 1937; reemployed April 4, 1938; again laid off August 3, 1938; reemployed April 16, 1939, and was working at the time of the hearing. He joined the union July 6, 1937, and attended its meetings but did not sign up other members, although he solicited some. He was transferred from lehr 2 to lehr 12 about August 16, 1937. Petitioner's supervisory employees knew he belonged to the union at the time he was laid off. Complainant received the regular Christmas bonus in 1937, three months after he was laid off, and when rehired, received the same rate of pay per hour he was getting at the time of his lay-off, although the type of work was different due to changes in the plant organization. The Board based its decision as to this complainant on this transfer to lehr

12 and the fact that petitioner's supervisory employees knew of his union membership.

There is no evidence in the record that complainant's foreman, Wolfe, who directed his transfer to lehr 12, had any knowledge at that time that its furnace would subsequently close down. The discharge of an employee belonging to a union, no more appearing, is insufficient to support a finding of discrimination and where the job held by complainant was discontinued in the ordinary course of business and no replacement employee hired, the lay-off or discharge was not discriminatory. Petitioner, in laying off complainant, acted within its rights and within the ordinary course of its business, and the Board had no substantial evidence on which to base its order.

Complainant Anthony Laratta had worked intermittently as a bricklayer rebuilding furnaces in the maintenance department from 1929 to 1935, in which year he became a lehr attendant in petitioner's packing department and was acting in that capacity when laid off September 17, 1937. He was re-employed three days later as a bricklayer, rebuilding a furnace.

The uncontradicted evidence shows that when Laratta was laid off previously, he was re-employed as a bricklayer to rebuild tanks. He was transferred to lehr 12 about five weeks before his lay-off. The complainant joined the union July 6, 1937, and thereafter urged his co-employees to join and attended organization meetings, but did not pass out any application cards. The uncontradicted evidence shows there was no brick work available on the day of his lay-off and he was immediately recalled when there was brick work to do.

The Board based its decision largely on Laratta's transfer to the furnace which subsequently closed down and on the further fact that Brand told Amer Hall, a boss packer, that Laratta would never lay brick for petitioner as long as he was there. The statement of Hall is destroyed by the fact that Brand was responsible for Laratta's re-employment three days later and while the Board finds that his re-employment was because Brand wished to use him to ascertain what occurred at union meetings, the complainant states he refused to do this, and it was not a condition of his re-employment. He was offered re-employment by petitioner in April, 1939, which he rejected because he could obtain better wages as a bricklayer elsewhere. There is no sub-

stantial evidence to support the Board's order as to this complainant.

Lester Glenn Lewis was first employed by petitioner in 1917 as lehr man and voluntarily quit in 1925. On February 1, 1934, he was re-employed in that capacity and worked steadily until laid off September 17, 1937. He was re-employed April 14, 1939, and discharged May 24, 1939. Complainant was transferred to lehr 12 from lehr 7 about August 25, 1937.

Complainant joined the union July 6, 1937, and became active in its behalf. He solicited membership in it while at work. One of the selectors working with Lewis made a trivial mistake in her work and at the time Lewis threatened to report her to the department superintendent and told her that it would later cost her $50 to sign up with the union and she had better do it then. He afterwards visited this employee's home and compelled her to sign a union membership card for herself and her husband who was also an employee of petitioner. Complainant persisted in seeking signatures during working hours and caused two selectors to stop their work and sign applications. About the last of August, Brand warned Lewis he must stop interfering with workers on the lehrs during working hours.

Among the fundamental duties of employees is the obligation to yield obedience to all reasonable rules, orders and instructions of their employers. The use of integrated machines in our modern manufacturing system requires the special attention of each employee to his particular duties because a failure on the part of one employee in his line of duty may seriously interfere with the co-ordinated performance of another employee's work. The National Labor Relations Act in no way limits the right of the employer to require of its employees attention to duty at all times during working hours.

Petitioner was compelled to lay off some of its employees because of the exigencies of its business and there is no substantial evidence to support the Board's finding of fact that complainant Lewis was discriminated against because of his union activity.

Complainant Schnell was first employed by petitioner in April 1936, in its repack department and in about two weeks was transferred to the packing department as a lehr man. He was laid off September 17, 1937, and resumed work April 15, 1939, and was

682

working at the time of the hearing. He was nineteen years of age when laid off at which time he was married and his wife was also working for petitioner. He was transferred by Smouse, his foreman, about the middle of August, from lehr 6 to lehr 11. His wife was a member of the union; had worked for petitioner longer than he had and continued her union membership and was employed uninterruptedly by petitioner down to the time of the hearing. On September 16, 1937, complainant charged the petitioner with treating his wife unfairly in connection with the payment of the employees' bonus. After he had been shown the records as to how the bonus was determined, he took exceptions to the method of determination as to all the employees. The reason given by Smouse for selecting complainant as one of those to be furloughed was that he was non-cooperative and objected to everything done about the employees' bonus and that his wife was working on the same shift. After he had been shown the records as to how the bonus was determined, he took exceptions to its method of determination as to all the employees. It has heretofore been pointed out that complainant came within the group of employees which Smouse testified was transferred to lehrs 11 and 12 for the purpose of laying them off, but Smouse, in his revised testimony, stated that the facts he had enumerated about the reasons for laying off Schnell were true. The uncontradicted evidence shows that when complainant was transferred to lehr 11, two employees who were as active for the union as he, were transferred from lehrs 11 and 12 to other lehrs which did not shut down. It also shows complainant was a marginal employee and would naturally fall into the first group to be laid off when, from business necessity, the number of employees was reduced. There is no substantial evidence to support the Board's finding as to this complainant.

Complainant Francis M. Daugherty began his employment with petitioner about 1919 working at various jobs. His last continuous employment began in 1933 as a ware handler in the shipping and storing department. He was classified as a ware handler and extra tractor driver in 1935. He joined the union on July 6, 1937, and was active in its organization in the plant. In July of that year he was elected treasurer of Local No. 55 and became its president in December, 1938.

On September 21, 1938, complainant was laid off and thereafter petitioner refused to re-employ him. On this date the number of employees in the shipping and storage department where complainant was working was reduced from 60 to 24. In November, 1938, six employees who had been laid off in September were rehired and in March, 1939, fifteen returned to work and in April, 1939, nine more. Plant manager Beishline, who testified that he considered Daugherty's case throughout the summer of 1938, directed his lay-off and also determined that he was not to be rehired. He stated that the complainant had become so embittered and antagonistic toward petitioner, he no longer believed him to be a satisfactory employee and that Daugherty's foreman told him the complainant had said the company was dirty, which statement complainant denied making. Petitioner held weekly departmental meetings which all employees were expected to attend, at which the previous week's safety inspection, good housekeeping inspection, efficiency report and other items particularly important to operation were discussed. The complainant refused to attend these meetings, assumed a sneering attitude toward them and let it be known he considered them of no importance. They were usually held just before work time and attendance was voluntary. According to the uncontradicted evidence, Daugherty would sit outside of the meeting place and refuse to go in when invited, and was the only employee who consistently absented himself. The Board, in its decision, says "that while we do not condone Daugherty's conduct, it does not appear that Beishline, or any of the supervisors in the department undertook to persuade Daugherty that he should conduct himself otherwise." The Board found Daugherty guilty of the derelictions which petitioner assigned for dispensing with his services, but notwithstanding these facts concluded the reason for the discharge was his union activity. It is true petitioner's supervisory officials knew that Daugherty was an active member and officer of the union. He was separated from petitioner's services after he had testified at the Board's previous hearing and in his testimony fully disclosed his interest in and effort to organize petitioner's employees. These facts standing alone lend support to the Board's decision, but when weighed in connection with Daugherty's admitted conduct toward his employer, do not arise to the dignity of substantial evidence

and do not support the Board's finding that complainant was discharged because of his union membership or that petitioner thereby discriminated against him with respect to his hire and tenure of employment for the purpose of discouraging membership in a labor organization. Unprovoked insolence or disrespect on the part of an employee toward his employer, or the latter's representative, furnishes just grounds for the discharge or dismissal of the employee, and the National Labor Relations Act has in no wise abrogated this rule.

Complainant James Shaffer worked in the shipping and storing department as a ware handler during the spring and summer of 1933 and 1934; was re-employed in the spring of 1935 in the maintenance department until the spring of 1937 when he was assigned to driving a tractor in the decorating department. He and three other drivers in that department were under the supervision of Burchett, superintendent. Shaffer joined the union July 7, 1937, and thereafter solicited memberships. He testified that about July 10th Burchett warned him "if you don't keep your damn mouth shut in the decorating department about the C. I. O. you are not going to have no job" which statement Burchett denies. Complainant drove a gasoline-operated tractor hauling glassware about the decorating department which was badly congested. When he began work, he was cautioned by his foreman about this crowded condition and instructed to be careful about handling his machine. Shaffer denied this, but the trial examiner refused to credit his denial. E. W. Ball, who was not an employee of petitioner at the time of the hearing, but was Shaffer's foreman when he was discharged, testified that complainant drove too fast, knocked ware from serving trays and broke it and depended too much on the tractor's brakes to avoid collisions and on its whistle to warn employees of his approach. A number of Shaffer's co-employees testified to his reckless driving and three of the girl employees said that immediately before his discharge, he drove up rapidly behind them while they were facing a bulletin board, blew his whistle loudly and almost struck them and badly frightened them. There is no substantial contradiction of the testimony of numerous witnesses that Shaffer was guilty of the grossest negligence in the operation of the tractor. The Board, in its decision, recites most of the foregoing testimony, but disregards all of it and bases its decision that the complainant was discriminated against on the sole ground that petitioner knew of his union activity and membership and therefore he must have been discharged for that reason. The evidence overwhelmingly shows complainant was habitually negligent in the discharge of his duties, and under such circumstances petitioner was justified in dispensing with his services, and the fact of his union membership and activity is immaterial.

My colleagues do not agree with the conclusions here announced and are of the opinion that the rules announced in National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A. L.R. 307; National Labor Relations Board v. Falk Corporation, 308 U.S. 453, 461, 60 S.Ct. 307, 84 L.Ed. 396; National Labor Relations Board v. Link-Belt Company, 311 U.S. 584, 597, 61 S.Ct. 358, 85 L.Ed. 368; National Labor Relations Board v. Waterman Steamship Corporation, 309 U.S. 206, 209, 60 S.Ct. 493, 84 L.Ed. 704, require the enforcement of the Board's order.

I am of the opinion these decisions are not binding presently because the issues and facts in the case at bar are substantially dissimilar. Since my colleagues do not agree, it follows that a decree may be entered directing the enforcement of the Board's order and denying the petition for review.