## NATIONAL LABOR RELATIONS BOARD v. NEWBERRY LUMBER & CHEMICAL CO.

### No. 8863.

Circuit Court of Appeals, Sixth Circuit.

Dec. 9, 1941.

As Amended Feb. 2, 1942.

Helen Humphrey, of Washington, D. C. (Robert B. Watts, Laurence A. Knapp, Ernest A. Gross, Sylvester Garrett, and

Helen F. Humphrey, all of Washington, D. C., on the brief), for petitioner.

John E. Tracy, of Ann Arbor, Mich., for respondent.

Before ALLEN, HAMILTON, and MARTIN, Circuit Judges.

MARTIN, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order entered November 17, 1939, directing respondent to cease and desist from discouraging, by discrimination, membership in a named organized labor union, or any other labor organization of its employees; from dominating, interfering with, or contributing financial or other support to a named independent union, or any other labor organization of its employees; from assaulting, beating, encouraging violence against or in any manner interfering with, restraining or intimidating, directly or indirectly, members of the named organized labor union, or in any other manner interfering with, restraining or coercing its employees in the exercise of their right to self organization, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection as guaranteed in Section 7 of the National Labor Relations Act. 49 Stat. 449, c. 372, 29 U.S.C.A. § 151 et seq.

The order sought to be enforced directs also that respondent offer immediate reinstatement to seven named former employees to their former positions, without prejudice to their seniority and other rights and privileges, and that another named employee be offered employment in his former or in a substantially equivalent position, if now available for him in accordance with the usual method of reemployment by respondent following lay-offs or shut-downs, or, if no such employment is now available, that he be offered, in accordance with such usual method, employment as soon as available and before any other persons are hired for such work.

This court is besought to enforce the further orders of the Board, directing back pay to the eight discharged employees and withdrawal of recognition from and disestablishment of the independent union, as representative of respondent's employees in dealing with respondent concerning grievances, labor disputes, wages, rates of pay, hours of employment, or other conditions of employment; and ordering the usual notification of the Regional Director and the posting of customary notices.

Restatement in the language of this court of the Board's findings of fact, upon which its conclusion that respondent had been guilty of unfair labor practices was based, seems less desirable in the instant case than to set forth the verbatim narrative of the Board in a footnote. Therefore, for a review of the facts, see footnote.[1]

■ From examination of the record, adequate substantial evidence has been

[1] Findings of Fact by the National Labor Relations Board as to unfair labor practices.

"A. Interference, restraint, and coercion.

"On March 5, 1937, Local 2530 began an organizational drive in the upper Michigan peninsula. Within a few months, strikes at mills and camps spread throughout the territory surrounding Newberry. This activity culminated in the negotiation by Local 2530 of approximately 65 collective bargaining agreements covering employees in this area. The first of the respondent's Newberry employees to join Local 2530 was Matt Ahonen, who did so on March 26. Seven other members were recruited among the respondent's Newberry employees between March 26 and June 1. On several occasions during this period Ahonen, Frederick Sayles, Victor Anderson, Gust Koivu, and Oscar Maki, all employees at the Newberry plant, talked about union activities with Foreman John Johnson and with Albert Rahn, supervisor of the respondent's loaders. In several instances, Johnson and Rahn took occasion to disparage unions in general, and referred to them as 'graft' organizations. On May 13 Foreman Johnson engaged Ahonen in a conversation about a strike at a nearby town. Ahonen told Johnson that he had joined Local 2530. He was discharged the following morning. At a later date Ahonen was told by Charles Pajanen, foreman of the respondent's woods railroad, that on June 4, 1937, Hamilton had issued instructions to Pajanen to discharge any union men working under him.

"Near the end of May, 1937, Local 2530 established strike and relief headquarters at a building in Newberry known as the Workers Hall. Thereafter its organizational drive in the vicinity of Newberry was intensified and a strike committee, among other activities, distributed union literature at the homes of the respondent's mill employees.

834

found to support the findings of fact of the National Labor Relations Board.

 In National Labor Relations Board v. Waterman Steamship Corp., 309 U.S. 206, 208, 209, 60 S.Ct. 493, 495, 84 L.Ed. 704, the Supreme Court pointed our path of duty: "In that Act [49 Stat. 449, Sec. 10(e), 29 U.S.C.A. § 160(e)], Congress provided, 'The findings of the Board as to the facts, if supported by evidence, shall be conclusive.' It is of paramount importance that courts not encroach upon this exclusive power of the Board if effect is to be given the intention of Congress to apply an orderly, informed and specialized procedure to the complex, administrative problems arising in the solution of industrial disputes. As it did in setting up other admin-

"On May 24, 1937, all of the lumberjacks at the respondent's Shingleton lumber camp went on strike. On May 28, all of the lumberjacks at its lumber camp known as Camp Number 9 also struck. On June 3, about 100 union members and sympathizers, the majority of whom were strikers from the respondent's two logging camps, gathered in Newberry to attend a strike benefit dance to be held that night at the Workers Hall. The same day several of the respondent's employees requested Paul Moran, chairman of Local 2530's strike committee, to visit the respondent's plant in order to discuss with other employees the possibility of a strike. It was agreed that on the following morning the committee should visit the plant for this purpose.

"About 6 a. m. on June 4, 1937, the same group of about 100 men who had gathered the previous day at Newberry, left the Workers Hall and marched to the respondent's plant. The men, who wore ribbons bearing the designation 'strike committee,' were unarmed and approached the plant peaceably, marching two abreast.

"Phillip S. Hamilton, the respondent's treasurer and plant manager, who is also president of the Village of Newberry, had in the meanwhile learned and had informed the local sheriff that the strike committee was coming to the plant. Both he and Superintendent Elmer Johnson arrived at the plant at about 6 a. m., before the arrival of the strikers and 2 hours prior to the regular opening time. At this time the company fire whistle blew, although ordinarily it is blown only in case of fire. On June 3, there was talk among the employees in the plant to the effect that the blowing of the whistle would be the signal for them to gather at the plant to drive away the strikers.

"About the time the plant fire whistle blew, Foreman James Burnsides came into the cast-house where night shift employees were still working and exhorted the men, 'Come on gang, let's chase the strikers out.' Shortly after the whistle blew a crowd of about 300 persons assembled outside the mill, including the local sheriff, Plant Manager Hamilton, Superintendent Elmer Johnson, Foremen Radaska, Westman, Ford, Fancett, and Whitmarsh, and the group of night-shift employees led by Foreman Burnsides. Members of this crowd were generously armed with clubs, iron bars, gate handles, rubber hose, hose couplings, and iron bolts.

"As the column of strikers neared this group, the sheriff halted them with the admonition that they were on private property, and that trouble would ensue unless they left. Moran, leader of the strikers, replied that all his men desired was an opportunity to talk with the respondent's employees to ascertain if they wished to vote to join the strike. Moran and the sheriff then agreed that the strikers should withdraw and later send a committee back to talk with the employees. Thereupon the sheriff took Moran by the arm and led him about 50 feet down the road away from the plant, as the other strikers followed. At this juncture, the sheriff dropped Moran's arm and stepped aside. Foreman Frank Whitmarsh immediately shouted, 'Let's go,' and swung a club in the air. The marching strikers were then set upon and brutally attacked.

"One of the marchers named Joseph Kist stumbled and fell. Another marcher, Edward Evans, turned to help Kist, but was beaten off with a club. Evans last saw Kist rising to his knees only to be pounded to the ground again by Foreman Whitmarsh, who wielded a club and was assisted by an unidentified person. Kist died soon after. When David Maki, an employee and Local 2530 member, came to the plant on hearing the fire whistle he was knocked down to the ground as Foreman Adolph Westman shouted, 'There is one of the union men. * * *' Numerous other union members or sympathizers were injured and beaten at the time. No arrests were made. None of the respondent's foremen, agents, or employees were disciplined for their participation in these events. No damage was done to the respondent's property.

"As a result of this violence, a number of the marchers were driven out of

istrative bodies, Congress has left questions of law which arise before the Board—but not more—ultimately to the traditional review of the judiciary. Not by accident, but in line with a general policy, Congress has deemed it wise to entrust the finding of facts to these specialized agencies. It is essential that courts regard this division of responsibility which Congress as a matter of policy has embodied in the very statute from which the Court of Appeals derived its jurisdiction to act."

town; others, closely pursued by the attacking mob, took refuge at the Workers Hall. The mob, led in part by Foreman Radaska, Fancett, and Westman, thereupon evicted them from the Hall and proceeded to demolish the interior of the structure. Foreman Radaska, who broke in the door of the Hall with an iron bar, and Fancett, who smashed several windows, were among the first to enter the building. As a result of this activity the interior of the Hall was completely wrecked and the Hall rendered useless as a meeting place. In addition, Local 2530 records in the Hall were confiscated.

"As each man was evicted from the Hall he was struck on the head with a rock by Ted Johnson, son of Foreman John Johnson. Following this treatment, the beaten men were bodily loaded on a truck commandeered from a striker and driven out of town in the company of other union members and sympathizers who had been rounded up in other parts of Newberry. Among those engaged in corralling the latter group was Foreman Westman.

"About 9 a. m., an hour after work ordinarily commenced at the plant, some cars and a truck drew up at the home of the local justice of peace, James V. Kinsey. Men from the truck seized Kinsey, told him that his name had appeared in the union records captured that morning, loaded him on to the truck where Foreman Radaska was seated, and drove to the plant. En route it was decided that Kinsey should be dumped into one of the respondent's tar tanks, but this plan fell through when the chemical department foreman pointed out the possible fatal effects of such an immersion. Instead Kinsey was smeared with cup grease. At the plant the respondent's wood superintendent, Ralph Biers, witnessed the maltreating of Kinsey, but took no steps to protect him. Kinsey subsequently was carted away in a truck and dumped in a nearby gravel pit.

"During the course of the mob violence, six members of Local 2530 who reported to work at the regular hour were discharged by Superintendent Johnson. These men were gathered in a shack at the plant awaiting the commencement of operations when Johnson entered and told them: 'We don't need you. You fellows go home.' The men at all times since have been refused reinstatement.

"Hamilton, the respondent's treasurer and plant manager, generally denied that the respondent was in any way responsible for the events of June 4. He described the riot as 'spontaneous,' stating that there was 'a big roar and everybody started,' whereupon the sheriff lost control of the situation. Hamilton alleged that at this stage in the proceedings he went home and had his breakfast. He disclaimed knowledge of any of the events transpiring on June 4 after the outbreak of violence.

"During his testimony Hamilton asserted that prior to June 4, he had no knowledge of any union activity in the vicinity of Newberry and that the men marching to the plant were identified to him only by a 'pink ribbon' on their coats marked 'striker.' He admitted, however, that on May 24, he was told by Woods Superintendent Biers that the employees at the respondent's lumber camp at Shingleton had left their work, and that on May 28, he was informed by Foreman Lloyd Cook of Camp Number 9 that the lumberjacks there had left their employment after the camp had been visited by strikers. He also knew on May 24, that the employees at the nearby plant of Cleveland Cliffs Mining Company had gone on strike. Although he read local newspapers he denied ever seeing anything in them about the organization of the timber industry. As has already been noted, the respondent's foreman, John Johnson, was informed by Matt Ahonen on May 13, that the respondent's plant was being organized. On June 3, Hamilton knew of the advent of the strikers and notified the sheriff who deputized several men to protect the respondent's premises. In view of these facts we deem Hamilton's protestation of ignorance of union activity to be unworthy of credence.

"While Hamilton himself did not actively participate in the mob violence of June 4, the circumstances justify the conclusion that he acquiesced and consented to the participation of the respondent's foremen in such activities. In this connection, we note that the mob attacking the union men was assembled out side of the respondent's plant by the blowing of the respondent's fire whistle; that on June 3, it was understood that the blowing of the whistle should be the signal to gather at

We pass, therefore, to a consideration of the questions of law, which the respondent has presented.

The respondent charges that (1) it did not have before the Board the fair and impartial investigation and hearing contemplated by the National Labor Relations Act; (2) respondent is financially unable to comply with the back pay provisions in the order of the Board; (3) respondent cannot, with safety to its operations, reinstate the complainant employees; and (4) the order sought to be enforced is patently unfair and oppressive as to the back pay requirements.

(1) The first two contentions will be discussed together.

In answer to the original complaint filed October 29, 1938, with appropriate notice of the hearing to be held on November 7, 1938, in the town of Newberry where it operates its plant, respondent denied all adverse allegations in a comprehensive pleading drawn in appropriate legal form by its secretary, a professor of law at the University of Michigan. In the concluding paragraph of the answer, it was averred that "in this proceeding respondent is prepared and willing to cooperate with the National Labor Relations Board in an endeavor to arrive at the truth of the complaints involved, and will, on request, furnish to counsel for the Board, or to its Examiner, or to any person whom the Board may suggest, the names and addresses of all witnesses whose testimony it believes would throw light upon the matter in controversy." Then was added: "As this respondent has not the means to employ counsel in this proceeding, also it has not the means to summon witnesses in its behalf."

The record shows that no attorney at law representing respondent appeared at the hearing, but that Phillip S. Hamilton, its treasurer and plant manager, in response to a question from the examiner, stated that he represented respondent. Mr. Hamilton said that he would be glad to furnish the names and addresses of any witnesses whom the Trial Examiner might desire to call and observed that he was appearing without counsel.

The Examiner explained:

"These hearings are primarily designed to determine the facts in the controversies that arise and which give rise to the hearings. It is the expectation that a respondent will at least be able to produce his own witnesses. I don't believe the regulations of the Board, issued pursuant to the provisions of the Act, provide the machinery for the Board supplying the defense, if you want to call it that, or the machinery for the defense of a charge which has been initiated—or a complaint which has been initiated through a charge, and in which the Board's Regional Counsel appears in the nature of an adverse party; nor does the Act provide for the Board supplying counsel to an indigent respondent.

"It seems to me, from past experience, that it shouldn't be an impossible matter for Respondent to summon to its aid and its assistance witnesses who are willing to testify to the facts which are involved in the case. Sometimes such witnesses require that they be paid their witness fees; most frequently they do not. I suggest that you give some thought to that. However, we will proceed and see what happens and what developments take place.

"The Trial Examiner can hardly or can only conduct the hearings to the extent of asking such information as appears to be available. He can hardly take the position

the plant to repel the union members and sympathizers; that Foreman Burnsides led a group of employees out of the plant to join the mob; that a number of foremen were leaders of the mob; and that Hamilton and Superintendent Johnson were present and witnessed the activities of the mob. In addition, a considerable part of the mob activity was carried on after working hours had commenced at the plant; and Kinsey actually was maltreated at the plant in the presence of Woods - Superintendent Biers. Even had Hamilton and Superintendents Biers and Johnson not given their tacit approval to the unlawful activity of June 4, the respondent cannot avoid responsi-

bility for the acts of its foremen, who were leaders of the mob. As already noted, no disciplinary action was ever taken against these foremen.

"We find that the respondent is responsible for the mob violence of June 4, 1937, and for the anti-union acts of its foremen in connection therewith. By the incitement and encouragement of such mob violence, by the anti-union conduct of its supervisory employees on June 4, and by the anti-union statements of its foremen prior thereto, the respondent has interfered with, coerced, and restrained its employees in the exercise of their rights guaranteed in Section 7 of the Act."

as acting as counsel for either side; rather, he must be a weigher of the facts as produced by both sides."

The attorney appearing for the Labor Board then called Hamilton as an adverse witness and examined and re-examined him at great length.

On the second trial day, the Examiner reminded Hamilton, as the latter left the witness stand, to bear in mind that he had the privilege, which should not be neglected, of cross-examining witnesses. Indeed, Hamilton had cross-examined the witness Kinsey on the first day of the trial. Finally, however, after numerous witnesses had testified, Hamilton, when asked by the Examiner if he had any questions to ask a certain witness, replied: "Mr. Examiner, I would like to state that I am not an attorney, and I am not qualified, and neither have I the authority. You have very graciously given me permission, but while I am not going to question the testimony, I leave it up to you. This is an impartial hearing and I know you want to bring out the truth, but I don't feel qualified to go ahead and do that questioning."

The Examiner again urged the lay representative of respondent, addressing him directly: "One does not necessarily need to be a skilled and trained attorney, nor a lawyer or counsellor, or solicitor or barrister to participate in a hearing of this character. Sane, sound, common business sense and horse sense is of perhaps even greater value. * * * A great deal of liberty is allowed on cross-examination. * * * While it is the function of the Trial Examiner to dig out all the facts that he can, it is not his function to do other than to see that all the facts which come to the surface or are apparently available, are properly and fairly presented. * * * You are in the best position to know what witnesses who are within your ken there are who know anything pertaining to this matter, and I think it is your duty to yourself and to your company to produce these witnesses and ask them to tell their stories. You may guide them with proper questions in whatever manner you see fit. You probably have noted that we have been informal here. The range of inquiry is wide. What we want to do is get a background of the basic facts and get the entire picture in such form that we can draw a true and correct conclusion, not one that is filled with a lot of inferences, but conclusions based upon facts which are produced here,

and that is the only way these hearings can be fairly conducted. * * * No one knows better than the management of the company the extent to which, if at all, these violations have taken place; so we have got to depend on the company to present its side of the story, after the union, through the mouthpiece of the Board's counsel, has presented its side; and the Trial Examiner can only sit here and try to evaluate and judge the facts produced, but please don't ask us to go out and to set up all of the defenses that you or counsel, if you had counsel, could conceive to these facts that are adduced in the testimony." The Examiner stated further that he wanted hearings conducted in such fashion that no one could go forth feeling that opportunity had not been afforded for presentation of all the facts on both sides of a controversy.

The treasurer, plant manager and lay representative of the company then expressed his appreciation, but replied that the company had not given him authority to act.

The Examiner rejoined: "Well, as local manager you have certain inherent authority, I think. However, that is entirely up to you and if the management of your company that directs you and under whose direction and guidance you are operating, desires you to be like tar baby and keep on saying nothing, why, that is a matter of policy, of course, with the company. * * * So that if your superiors are not inclined to present any evidence in connection with this matter, that, of course, is their business, but I want it to be understood thoroughly that we would like to have some evidence, if there is anything."

Hamilton repeated that he had been instructed to appear and to furnish the names and addresses of anybody wanted by the Examiner, but that he had not been authorized to cross-examine or to participate in the proceedings; and that he feared that he might possibly "get in wrong" with his company, if he should.

The Trial Examiner closed the colloquy with the remark: "Well, I don't want you to get in wrong with your company, but I want you to understand and appreciate that as the only representative of the company in apparent authority here, it is your privilege to appear and it is your privilege to cross-examine any witness who is placed on the stand by the Board or by the union, and it is your privilege to bring into this hear-

ing any witness whom you think might be able to add something to the story."

Throughout the trial, Hamilton, expressing his willingness to furnish the addresses of any witnesses whose testimony might be desired, was obdurate in maintaining his lack of authority to bring in witnesses in behalf of respondent. His own testimony consumes more than one-third of the printed transcript of the evidence. After the Board's attorney had rested his case, Hamilton again took the stand to clarify and explain certain matters in evidence. His entire familiarity with the material facts was apparent. The foremen who had participated in the riot nearby the plant and other employees participating were under his general supervision, yet he declined to call them. Standing upon his alleged lack of authority he refused, though repeatedly urged, to summons any witnesses in defense of the charges against the company of which he was an important official executive and for which he appeared at the hearing.

■ The requirement by an administrative tribunal that a party must submit, at his own expense, evidence in his behalf accords with the practice in both administrative and judicial proceedings. Pacific Live Stock Co. v. Lewis, 241 U.S. 440, 452, 36 S. Ct. 637, 60 L.Ed. 1084; cf. Low Wah Suey v. Backus, 225 U.S. 460, 470, 32 S.Ct. 734, 56 L.Ed. 1165.

■ This court would unhesitatingly refuse to enforce an order of an administrative board or agency, if issued pursuant to an unfair hearing or without due process of law. The requirements of fair trial and fair play is binding on administrative agencies as well as on courts. Powhatan Mining Co. v. Ickes, 6 Cir., 118 F.2d 105, 110; Ohio Bell Telephone Co. v. Public Utilities Commission of Ohio, 301 U.S. 292, 304, 57 S.Ct. 724, 81 L.Ed. 1093; Interstate Commerce Commission v. Louisville & Nashville Railroad Company, 227 U.S. 88, 91, 33 S.Ct. 185, 57 L.Ed. 431. But the record reveals no manifestation of bias or unfair play on the part of the Trial Examiner or the National Labor Relations Board. The Board based its findings on substantial evidence. The Examiner exhibited painstaking care to develop the full facts, by examining and re-examining, on his own initiative, numerous witnesses. He excluded, on his own motion, evidence proffered by the attorney for the Board deemed incompetent or irrelevant; and, as has been

shown, he repeatedly adjured the representative of respondent to produce witnesses in its behalf.

Moreover, it has not been shown that respondent was in such "dire financial straits" as to be unable to procure counsel to represent it at the hearing.

The Board found, as a matter of fact: "Beginning in 1935, the respondent underwent a reorganization pursuant to the provisions of the then Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207. In November of 1937, the plan of reorganization was confirmed by the District Court, and included a provision for a loan of $315,000 which was obtained from the Reconstruction Finance Corporation. Unsecured creditors were paid in full. The respondent's balance sheet as of September, 1938, reveals current assets in cash and inventories amounting to $540,671 and total liabilities of $310,462.78. Among its extensive properties, the value of timber lands is listed at over $700,000. The respondent's capital stock has a net book value of $1,693,986.75 after depreciation reserves of $1,283,084.84. We do not credit the claim that the respondent was financially unable to engage counsel or summons witnesses."

■ This finding was supported by substantial evidence and is binding here.

The comment of Chief Justice Hughes in National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 47, 57 S.Ct. 615, 629, 81 L.Ed. 893, 108 A.L.R. 1352, is applicable to the present situation: "Respondent was notified and heard. It had opportunity to meet the charge of unfair labor practices upon the merits, and by withdrawing from the hearing it declined to avail itself of that opportunity. The facts found by the Board support its order and the evidence supports the findings. Respondent has no just ground for complaint on this score."

■ In the case under review, respondent had a fair trial before an administrative tribunal, whose orders were based upon substantial evidence.

(2) The respondent maintains that it cannot, with safety to its operations in national defense industry, reinstate the complainants. The answer of respondent to the petition of the Board for the enforcement of its order contains the following averment: "The plants of respondent are engaged in complicated manufacturing

processes, some of them highly technical in nature, and offering great opportunities for sabotage. Respondent has been consulted by the War Department with reference to the manufacture of acetic acid for defense purposes under government order, and by the Navy Department for the manufacture of charcoal iron for ordinance manufacture. A plant so engaged on defense orders cannot safely employ aliens or persons holding views inimical to our form of government. Respondent is informed and believes that most, if not all, of the seven men ordered to be reinstated are aliens, and that all have political and economic views which would render their employment in such a plant unsafe."

■ The Circuit Courts of Appeal possess no jurisdiction to try issues of fact not presented to the National Labor Relations Board.

But, on petition for enforcement of an order of the National Labor Relations Board, the sole issue for determination by the court is whether the order of the Board was lawful, when made. National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 271, 58 S. Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307.

■ (3) There can be no question that the Board has power to order reinstatement of an employee with back pay to the date of reinstatement, allowing deductions of the employee's interim earnings. N. L. R. B. v. Mackay Radio Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381. There was substantial evidence before the Board to justify a back-pay order in the instant case. The Board ordered respondent to make whole seven persons named in paragraph 2(a) of the order for any loss of pay suffered by them from discrimination as to their hire and tenure of employment by payment to each of a sum of money equivalent to what he would have earned as wages from the date of discrimination to the date of offer of reinstatement, *less his net earnings during that period;* "deducting, however, from the amount otherwise due to each of the said employees, monies received by said employee during said period for work performed upon Federal, State, County, Municipal, or other work-relief projects, and pay over the amount so deducted to the appropriate fiscal agency of the Federal, State, County, Municipal or other government or governments which supplied the funds for said work-relief projects." A like order was entered as to another employee, named in paragraph 2(b), except that it was directed that his back pay should run from the date of discrimination against him to a specified date, April 1, 1938.

■ The quoted portion of the order touching deductions of work-relief pay must be eliminated as to all eight employees specified, in conformity with the decision of the Supreme Court in Republic Steel Corporation v. National Labor Relations Board, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6.

(4) Following oral argument before us, the respondent filed a motion to remand, praying, inter alia, that respondent be granted leave to adduce additional evidence before the Board on the questions whether the complainant employees would ordinarily have been employed by respondent from April 1, 1938, to February 1, 1940, during which period its plants were shut down, and thereafter; and whether the several complainant employees have endeavored to obtain other employment between June 4, 1937, and the date of the hearing to be held, if ordered.

As a matter of fact, the respondent's plant was shut down on April 1, 1938, and a large majority of its employees were laid off. The record is confusing as to whether, without any discrimination against them, all of the complainant-employees, after the plant shut down, were in line for retention, pursuant to seniority rights and normal custom, or at what times they could have been fairly laid off. These matters should be clarified. The Board must yet determine the amount of back pay to which each complainant is entitled and insufficient facts appear in the record upon which it could calculate appropriate allowances and deductions so as to award each man his just due. Additional evidence seems necessary. Cf. N. L. R. B. v. Somerset Shoe Co., 1 Cir., 111 F.2d 681, 690.

The National Labor Relations Act provides in section 10(e): "If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Board, its member, agent, or agency, the court may order such additional evidence to be taken before the Board, its member, agent, or agency, and to be made a part of the transcript."

█ Discrimination, generally, in the discharge of each of the eight complainants has been found by the Board upon substantial evidence. That settled issue will not be reopened.

█ The introduction of additional evidence will be limited as indicated, with the further right to any party to this proceeding to introduce proof as to what efforts toward other employment were made by the respective complainants after their discharge.

Except as granted in the particulars indicated, the motion of respondent filed November 12, 1941, is overruled for the reasons heretofore fully appearing in this opinion.

The petition of the National Labor Relations Board for enforcement of its order is allowed, as modified; and the cause is remanded to the Board for further proceedings in conformity with this opinion. This court will review the additional evidence to be adduced before the Board on the back-pay allowances, when "made a part of the transcript" pursuant to the statute, quoted, supra.